# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

WELLS LORY HILLBLOM, f/k/a )
NGUYEN BE LORY, )
                                 )
       Plaintiff, )
                                   )
       v. )     C.A. No. 2021-1034-MTZ
                                   )
WILMINGTON TRUST COMPANY, )
                                   )
       Defendant. )

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: December 8, 2025
Date Decided: July 8, 2026

Paul D. Brown, Samantha Callejas, CHIPMAN BROWN CICERO & COLE LLP, Wilmington, Delaware, David Z. Ribakoff, RIBAKOFF LAW FIRM, Los Angeles, California, *Attorneys for Plaintiff*.

Benjamin P. Chapple, John T. Miraglia, REED SMITH LLP, Wilmington, Delaware, John M. McIntyre, PORTER WRIGHT MORRIS & ARTHUR LLP, *Attorneys for Defendant*.

**ZURN, Vice Chancellor**

An institutional trustee agreed to manage a minor's sizeable inheritance, including by resolving and paying claims against it. The minor received the inheritance after years of litigation, in which he was represented by a guardian ad litem and counsel under a contingency fee agreement. The guardian's lawyers were entitled to a fee on a particular asset that was difficult to value. The trustee and the lawyers disagreed on the method of calculating that fee.

The dispute between the trustee and the lawyers persisted for over two decades. The trustee did not try to value the asset or resolve the dispute. As years passed, the minor grew up and the lawyers lost patience. In 2016, the lawyers submitted a settlement offer to the trustee; the trustee ignored it, and did not tell its beneficiary about the dispute or the settlement offer. The lawyers initiated legal action against the trustee; the trustee ducked that action and pointed the lawyers towards the beneficiary.

Reluctantly, the lawyers sued the beneficiary, who thought his trustee was assisting in his defense. Even after the beneficiary asked the trustee for information about the dispute, the trustee did not disclose the settlement offer. The beneficiary only learned of the offer when his adversary disclosed it in 2019. In 2020, the beneficiary settled the claim for roughly five times the offer his trustee had ignored.

The beneficiary sued his trustee in 2021 for breaches of trust and fiduciary duty. The action went to trial. This post-trial opinion concludes the beneficiary's

1

claims were timely given his relationship with his trustee and the information he received; the trustee breached its duties; and the beneficiary is entitled to damages in the amount by which the settlement exceeded the offer the trustee ignored, as well as his attorneys' fees in this action.

## I.    BACKGROUND[1]

Plaintiff Wells Lory Hillblom brings breach of fiduciary duty and breach of trust claims against his trustee, defendant Wilmington Trust Company ("WTC").[2] Those claims were tried over three days, offering the Court 129 joint exhibits and live testimony from eleven fact witnesses and two expert witnesses.[3]  The following facts were stipulated to by the parties or proven by a preponderance of the evidence.[4]

---

[1] Citations in the form "[last name] Tr. —" refer to trial testimony of the referenced witness, available at docket item ("D.I.") 163, D.I. 164, and D.I. 165.  Citations in the form "PTO ¶ —" refer to the parties' Amended Joint Pre-Trial Order, available at D.I. 159.  Citations in the form "POB —" refer to Plaintiff's Post-Trial Opening Brief, available at D.I. 169. Citations in the form "DAB —" refer to Defendant Wilmington Trust Company's Answering Post-Trial Brief, available at D.I. 173.  Citations in the form "PRB —" refer to Plaintiff's Post-Trial Reply Brief, available at D.I. 178.  Citations in the form "JX" refer to joint trial exhibits.  Citations in the form "MSJ BR" refer to the Telephonic Bench Ruling on Defendant's Motion for Summary Judgment, available at D.I. 95.

[2] D.I. 1 [hereinafter "Compl."] ¶¶ 57–64.

[3] D.I. 160.

[4] *Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967) ("The side on which the greater weight of the evidence is found is the side on which the preponderance of the evidence exists.").

Larry Hillblom was a founder of DHL, a successful international shipping and courier company.[5] In May 1995, Larry was declared legally dead after having disappeared at sea.[6] When he disappeared, Larry lived in the Commonwealth of the Northern Mariana Islands (the "CNMI"), an American territory in the South Pacific.[7] Probate proceedings for Larry's large estate (the "Estate") began in 1997 in the CNMI.[8]

Hillblom was born Nguyen Be Lory in Vietnam on December 2, 1994.[9] Hillblom pressed a claim he should inherit a share of the Estate as Larry's biological son.[10] In 1997, the probate court appointed J. Steven Grist as Hillblom's guardian ad litem.[11] Grist retained John Veague and Garrick Gallagher of Sanders & Parks, P.C. ("S&P") as counsel.[12] Grist and S&P proved Hillblom's claim to a share of the Estate.[13] Three other children proved they too were Larry's biological heirs.[14]

---

[5] PTO ¶ 5.

[6] *Id*. ¶ 8. In pursuit of clarity, I refer to Larry Hillblom by his first name. I intend no familiarity or disrespect.

[7] *Id*. ¶ 6.

[8] *Id*. ¶ 5, 10–11.

[9] *Id*. ¶ 7; Hillblom Tr. 419–20.

[10] PTO ¶¶ 5–11; Gallagher Tr. 93.

[11] PTO ¶ 11; Grist Tr. 667–68.

[12] JX 2 § I (A); PTO ¶ 13; Grist Tr. 670.

[13] Gallagher Tr. 96; PTO ¶ 18.

[14] Gallagher Tr. 95–96.

S&P's fee agreement with Hillblom (the "Fee Agreement") granted S&P thirty percent of any "Recovery" "received by or for the benefit" of Hillblom.[15] The Fee Agreement was modeled after the agreements between the other successful heir claimants and their attorneys.[16] The Fee Agreement's 30% fee was the lowest of those agreements.[17] The Fee Agreement sent disputes thereunder to arbitration in Saipan.[18] In January 1998, the Superior Court for CNMI approved the Fee Agreement as "fair and reasonable[.]"[19]

### A.    The Nguyen Be Lory Trust.

On April 21, 1999, the Nguyen Be Lory Trust (the "Trust") was formed to hold Hillblom's inheritance.[20] The Trust is governed by the Nguyen Be Lory Trust Agreement (the "Trust Agreement").[21] The Trust Agreement is governed by Delaware law.[22] WTC agreed to serve as trustee and to administer the Trust in

---

[15] JX 2 § II (A).  The Fee Agreement defines "Recovery" as "all payments or distributions of money or assets received by or allocable to or for the benefit of [Hillblom] from the Hillblom Estate by reason of his paternity and heirship claim.  The Recovery shall be calculated as [Hillblom's] allocable share of the Hillblom estate as a pretermitted heir, net of Estate administration expenses and estate liabilities but before payment by the Estate of allocable estate taxes." *Id*.

[16] Gallagher Tr. 99–101; *see* JX 129.

[17] Gallagher Tr. 113 (explaining the other agreements awarded fees between 36% and 50%).

[18] JX 2 § VI (A).

[19] JX 3.

[20] PTO ¶ 23; JX 5 at Recital.

[21] PTO ¶ 24; *see generally* JX 5.

[22] JX 5 § B, Art. III ¶ H (1)–(2).

4

accordance with the Trust Agreement.[23] The Trust's property includes "[a]ll property and interests in property, [] whether in cash or in kind, distributable to [Hillblom] from the Estate of Larry Lee Hillblom."[24]

The Trust Agreement includes "dispositive provisions" in Section A and "general provisions" in Section B.[25] The dispositive provisions govern Trust administration, including the distribution of Trust income,[26] payments to Hillblom,[27] and the use of Trust assets.[28]

Section B, Article II details WTC's authority as Trustee and the standard of care governing that authority.[29] WTC is "vested with all rights, powers, and privileges which an outright owner of the same property would have."[30] Article II

---

[23] *Id*. at Recital.

[24] *Id*. at Schedule of Property.

[25] *Id*. at Recital.

[26] *Id*. § A, Art. III ¶ A.

[27] *Id*. § A, Art. III ¶¶ B, D–E.

[28] *Id*. § A, Art. III ¶ C.

[29] *Id*. § B, Art. II ¶¶ A (1)–(27), B (1)–(2); *see id*. § B, Art. II at Recital ("[T]he Trustee is vested with the following powers and discretions until final distribution, in addition to any powers and discretions affecting the trust estate now or hereafter conferred by law.").

[30] *Id*. § B, Art. II ¶ A (1); *see id*. § B, Art. II ¶ B (1) ("When investing, reinvesting, purchasing, acquiring, exchanging, selling, operating, and managing trust property or otherwise administering the trust estate, the Trustee shall act with the care . . . that prudent persons acting either (a) in the management of their own personal financial affairs or (b) in a like fiduciary capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims to accomplish the purposes of the trust as determined from the trust instrument.").

makes clear WTC's "general or implied powers" are not limited by the specific grants of authority enumerated in the Trust Agreement.[31] It grants WTC "the sole and absolute discretion" to collect, hold, and dispose of Trust property.[32] The Trust Agreement also specifically grants WTC authority to resolve "Contested Matters:"

> [t]o pay or contest any claim; to settle a claim by or against the trust by compromise, arbitration, or otherwise; to release in whole or in part any claim belonging to the trust; and to prosecute or defend actions, claims, or proceedings for the protection of trust assets, and of the Trustee in the performance of the Trustee's duties.[33]

And the Trust Agreement specifically grants WTC the authority to pay S&P's fee:

> [WTC] shall have the power to use income and principal of the [T]rust to pay debts and expenses of [Hillblom] attributable to the proceedings relating to the estate of Larry Lee Hillblom, including without limitation, legal fees based upon the fee agreements [Hillblom] has with John Veague, Garrick Gallagher, and the law firm of [ ] Sanders & Parks, P.C., and fees and costs of other advisors as approved by the Superior Court of the Commonwealth of the Northern Mariana Islands or by the court supervising the trust's administration.[34]

As for WTC's standard of conduct, the Trust Agreement provides that WTC is "subject always to the obligations of a fiduciary."[35] WTC must act with the

---

[31] *Id*. § B, Art. II ¶ A (1).

[32] *Id*. § B, Art. II ¶ A (3).

[33] *Id*. § B, Art. II ¶ A (19).

[34] *Id*. § A, Art. III ¶ F.

[35] *Id*. § B, Art. II ¶ A (1); *see id*. § B, Art. II ¶ B (1) ("When investing, reinvesting, purchasing, acquiring, exchanging, selling, operating, and managing trust property or otherwise administering the trust estate, the Trustee shall act with the care . . . that prudent persons acting either (a) in the management of their own personal financial affairs or (b) in

6

standard of care exercised by "prudent persons acting either (a) in the management of their own personal financial affairs or (b) in a like fiduciary capacity" under similar circumstances.[36]

## B. Grist And The Estate Support Hillblom, And S&P Receives Fees.

After securing Hillblom's entitlement to assets of the Estate, Grist helped Hillblom and his extended family create a new life in Virginia.[37] Grist ensured the Trust paid for the family's home, of course.[38] But he went above and beyond to support Hillblom's family. Grist helped Hillblom's aunt get a driver's license, assisted the family with buying a vehicle, hosted the family at his home for dinner "many times," found an English language tutor for Hillblom's mother, caused Hillblom to enroll at the same school as Grist's children, secured Hillblom United States citizenship, helped members of his family get student visas, and generally was "very involved in [Hillblom's] acclimation to American life[.]"[39] Grist treated Hillblom as a member of his family, taking Hillblom on many Grist family vacations,

---

a like fiduciary capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims to accomplish the purposes of the trust as determined from the trust instrument.").

[36] *Id*. § B, Art. II ¶ B (1).

[37] Grist Tr. 708–09.

[38] *Id*. at 710.

[39] *Id*. at 708–09.

including to Europe.[40] And Hillblom reciprocated that closeness, referring to Grist as "Uncle Steve."[41]

Grist also interfaced with WTC to make sure it paid S&P's fees. On April 30, 1999, the Trust received its first distribution from the Estate, amounting to $7,500,000.[42] On June 16, Grist wrote to WTC to ensure S&P received payment.[43] Grist explained, "According to the terms of the Fee Agreement, Mr. Veague, Mr. Gallagher and [ ] Sanders & Parks are entitled to 30 percent" of that distribution as Trust Recovery.[44] WTC raised no issue, and paid S&P its 30% fee.[45] On October 8, the Trust received a distribution of $7,972,507.15.[46] Again, Grist wrote to WTC directing it to authorize and remit payment to S&P according to the Fee Agreement.[47] WTC did so. By May 2000, the Trust received approximately $44.6 million from the Estate, and WTC again paid S&P its thirty percent, approximately $13.4

---

[40] *Id.*

[41] *Id.* at 710; JX 85.

[42] PTO ¶ 19; JX 2; Gallagher Tr. 124–25.

[43] JX 6.

[44] *Id.* at 2.

[45] PTO ¶ 19.

[46] *Id.* ¶ 20; JX 7.

[47] PTO ¶ 20.

million.[48] WTC sought Grist's approval before paying S&P its fees under the Fee Agreement.[49]

In the meantime, in April 2000, Larry's heirs and their representatives had reached a court-approved Global Settlement Agreement apportioning the Estate's cash and non-cash assets among Larry's heirs and a charitable trust, with 60% going to the heirs.[50] For non-cash assets, the Global Settlement Agreement called for liquidation and using a liquidating trust to divide the proceeds.[51] On April 22, 2000, the Estate assigned its non-cash assets to a liquidating trustee.[52] This case centers on one particular non-cash asset: ARW Company, which held interests in two cellular telecommunications companies, Davenport Cellular Telephone Company ("Davenport") and Madison Cellular Telephone Company ("Madison").[53] The ARW Company's interests were transferred to ARW, LLC ("ARW"), formed to distribute those interests to the heirs and charitable trust.[54] By April 28, Hillblom's Trust

---

[48] *Id.* ¶ 21.

[49] Grist Tr. 696.

[50] JX 8 at 3; JX 17 at 2–4; JX 10; Gallagher Tr. 97.

[51] JX 8 at 5 (identifying the non-cash assets to be placed in the liquidating trust as the non-cash assets listed on "Exhibit B" of the Global Settlement Agreement); *id.* at Ex. B; JX 10.

[52] JX 17 at 3–4.

[53] JX 8 at 3; JX 10.

[54] JX 20; Gallagher Tr. 122.

received a one-time distribution of a 14.85% interest in ARW.[55]  At that time, the Trust's ARW interest was illiquid and difficult to value.[56]  S&P did not request or receive any fee on that non-cash distribution.

### C.    The ARW Fee Dispute

On October 3, 2002, ARW sent Gallagher ARW's 2001 Schedule K-1 and a check for a $87,615.00 cash distribution to Hillblom's Trust.[57]  That check represented ARW's first cash distribution.[58]  Gallagher promptly sent the check and Schedule K-1 to WTC, and asked that WTC pay S&P thirty percent.[59]

Thus began eighteen years of disagreement over how to calculate S&P's fee on the Trust's interest in ARW: specifically, whether S&P was entitled to thirty percent of all ARW cash distributions into the future, or thirty percent of the fair market value of the Trust's interest in ARW when the Trust received it in April 2000. WTC solicited Grist's opinion on Gallagher's fee request.[60]  On October 15, Grist wrote to Gallagher, copying WTC.[61]  Grist took the position that the fee should be calculated as "thirty percent of the fair market valuation of ARW on the date it was

---

[55] JX 10 at 1; JX 29 at 2; Jones Tr. 657.

[56] JX 12 at 2.

[57] JX 15 at 4, 5.

[58] *Id.*; JX 29 at 1.

[59] JX 15.

[60] JX 16 at 1.

[61] *Id.*

10

distributed to [Hillblom]."[62]  Grist acknowledged he was unaware of the then fair market value of ARW; noted such a valuation "might be difficult to determine;" and specifically observed "a valuation was assigned to the Estate's interest in ARW on the 706 Tax Return, but I would not readily concede that that figure is one we should rely on."[63]  Grist's letter invited Gallagher to propose an alternative approach if he disagreed.[64]

WTC took no action at that time.  It did not pay S&P anything on the ARW interest or cash distribution.[65]  The parties sporadically exchanged correspondence on S&P's ARW fee over the next decade.[66]

In 2012, WTC acknowledged the Trust still owed S&P's ARW fee.[67]  That fall, WTC began communicating directly with S&P.[68]  S&P maintained its fee should be based on ARW's cash distributions to the Trust, just like other cash distributions.[69]  Gallagher noted counsel for the other heirs "were paid fees on the interim distribution received from ARW and then on the sale proceeds when a portion was

---

[62] *Id*. at 1; *see* Grist Tr. 721.

[63] JX 16 at 1–2.

[64] *Id*. at 1.

[65] PTO ¶¶ 26–37.

[66] JX 17; JX 21; JX 22; JX 23.

[67] JX 26 at 2.

[68] *Id*.; JX 27.

[69] JX 26 at 1–2.

11

liquidated."[70] WTC took the position that under the Fee Agreement, S&P's fee is "based on the value of assets received from the Estate" and proposed calculating it using ARW's K-1.[71] WTC punted the issue to January 2013.[72]

Hillblom turned eighteen in December 2012.[73] WTC continued as trustee, ensuring the Trust provided for his living expenses.[74] WTC intimately supported Hillblom's financial and personal affairs, including by filing his taxes, preparing his will, supporting his education, paying legal fees, and providing monthly cash distributions to support a monthly budget WTC reviewed.[75] WTC reviewed Hillblom's monthly budget and exercised discretion over his living expenses.[76] Hillblom often interacted with Allison Patni at WTC, including when he moved to Los Angeles and when he needed a will.[77] Patni explained certain Trust Agreement provisions to Hillblom, and ensured Hillblom executed documents necessary for Trust administration.[78] WTC's role in Hillblom's life was not limited to financial

---

[70] *Id*. at 1.

[71] *Id*. at 2.

[72] JX 27 at 2.

[73] PTO ¶ 32.

[74] Hillblom Tr. 425.

[75] JX 34; JX 40; JX 42; JX 43; JX 48; Hillblom Tr. 424–25; White Tr. 608–09.

[76] White Tr. 609; JX 41 at 2 (denying Hillblom's request "for a $2 million principal distribution for a personal investment").

[77] Hillblom Tr. 424–25.

[78] JX 34; JX 40 at 2; JX 41; Hillblom Tr. 422–26, 448–49.

matters.[79]    When Hillblom went through a particularly difficult period, WTC instructed him to seek treatment and suggested a specific facility.[80]

WTC retained ownership of the S&P fee dispute after Hillblom turned eighteen.  In June 2013, WTC informed Gallagher that Grist was no longer Hillblom's guardian and instructed Gallagher to direct any future S&P invoices to WTC.[81]  In August, WTC Vice President Randi Dlott confirmed Grist "no longer ha[d] a fiduciary role" and that she had reviewed S&P's most recent invoices for WTC "as Trustee."[82]  Dlott acknowledged "[WTC] ha[s] not yet compensated you for your services on ARW" and noted WTC was "internally discussing a proposed resolution."[83]  Correspondence continued into December.[84]  WTC maintained S&P's ARW fee should be based on the fair market value of Hillblom's interest in ARW at the time of transfer to the Trust.[85]  At the same time, WTC acknowledged "[i]t is very difficult to obtain information necessary to retroactively value an asset that was received 13 years [ago], but [we] think that with the help of a valuation expert,  you

---

[79] JX 48 at 2–8.

[80] Hillblom Tr. 451–54.

[81] JX 30 at 2.

[82] *Id*. at 3–4.

[83] *Id*. at 4.

[84] JX 31; JX 32; JX 33.

[85] JX 32 at 1–2.

and the bank will need to agree upon such a value."[86]  Neither WTC nor S&P engaged a valuation expert.[87]

On October 1, counsel to another heir named David Axelrod wrote to WTC explaining he received his contingency fee on ARW cash distributions to his client's trust.[88]  He explained that ARW had always been difficult to value, and that nobody seriously considered relying on the Form 706 value.[89]

On December 10, WTC offered S&P $79,086.00 as its entire ARW fee plus interest (the "2013 WTC Offer").[90]  It calculated that amount based on ARW's fair market value when received by the Trust, informed by the Form 706 value.[91]  It used the consumer price index for interest.[92]  The December 2013 Offer concluded:

> I understand that your firm will probably not accept the $61,034 amount.  As an alternative we could consult with an outside valuation firm to see if they could produce an appraisal as of the year 2000.  Your firm and the bank could split the costs of the appraisal.  It is possible, of course, that the appraised value could exceed the value of the

---

[86] *Id.* at 2.

[87] Dearman Tr. 495; Gallagher Tr. 213.

[88] JX 129 at 2 ("The value of the annual distributions from ARW can vary depending on the profitability of the profitability of the underlying businesses and whether there have been any liquidations of the holdings in which ARW has a minor share interest.  At least $1 million has been received by or distributed to the capital account credit of each [heir].").

[89] *Id.*

[90] JX 33.

[91] *Id.* at 2; Dlott Tr. 581.

[92] JX 33 at 2; Dlott Tr. 586.

distribution, but it would satisfy the bank's fiduciary duty to pay your firm in accordance with the Fee Agreement as written.[93]

Dlott included the invitation to retain a valuation professional "based on a concept of fairness."[94]

Gallagher did not respond to the 2013 WTC Offer.[95] Neither WTC nor S&P commissioned an appraisal of ARW. By the end of 2013, the Trust had received eleven ARW distributions totaling $991,239.[96] The dispute went dormant again.[97]

In August 2016, Gallagher raised the ARW fees again with WTC.[98] Patni resent the 2013 WTC Offer to Gallagher.[99] Gallagher noted he had not received it the first time, positing it had gone to spam or been misfiled.[100] Gallagher thought the 2013 WTC Offer was unacceptable because it was not based on "a real value for the property" that anyone considered or would have accepted when ARW was

---

[93] JX 33 at 3.

[94] Dlott Tr. 594.

[95] JX 35 at 1–3.

[96] JX 37 at 1.

[97] PTO ¶ 37.

[98] JX 35.

[99] *Id*. at 2; Gallagher Tr. 215–16; *see* JX 33.

[100] JX 35 at 1.

distributed to the Trust.[101]  In November, Gallagher discussed S&P's unpaid fee with WTC, and WTC invited him to share a proposal.[102]

On December 6, S&P offered to settle the ARW dispute—for all ARW fees from 2002 into the future—for $300,000 (the "2016 S&P Offer").[103]  S&P explained the offer would expire on December 20.[104]

The next day, Patni emailed Hillblom seeking his input on certain Trust decisions.[105]  She did not mention the S&P fee dispute or the 2016 S&P Offer.[106]

When S&P made the 2016 S&P Offer, Neil Derman was the WTC attorney charged with handling the ARW fee dispute; Dlott had left WTC's legal department in 2015.[107]  Derman did not know the history of the dispute.[108]  He let the 2016 S&P Offer lapse without acknowledging it.[109]  Derman understood the 2016 S&P Offer to be a settlement offer and that typically, a trustee would share a settlement offer

---

[101] Gallagher Tr. 174 ("706 value is never what anyone involved in this estate thought was the value of that asset or someone would have taken it for that amount."); *see also* JX 129.

[102] Gallagher Tr. 183–84; Dearman Tr. 487–88; JX 38.

[103] JX 39.

[104] *Id*. at 2.

[105] JX 40 at 2.

[106] *Id*.

[107] JX 38 at 2; Dlott Tr. 591.

[108] Gallagher Tr. 183–84; Derman Tr. 488–89.

[109] Gallagher Tr. 186–87.  Derman provided no explanation for his failure to acknowledge the 2016 S&P Offer; he implied he did so because it "was a take-it-or-leave it" offer. Derman Tr. 500.

with the beneficiary.[110] Yet Derman did not share the 2016 S&P Offer with Hillblom.[111] At trial, Derman took the position that WTC's duty to Hillblom was constrained by the Trust Agreement, which did not allow WTC to "negotiate above what was written within the [F]ee Agreement."[112] He explained the 2016 S&P Offer was unacceptable to WTC because "the offer exceeded the valuation of the asset," making S&P's offer unreasonable.[113] After the 2016 S&P Offer, S&P would not hear anything from WTC for seven months.[114]

On May 3, 2017, Derman sent S&P a repackaged version of the 2013 WTC Offer (the "2017 WTC Offer").[115] Derman explained the 2017 WTC Offer repeated Dlott's 2013 use of the Form 706 value because "there was [no] additional evidence presented to come to any different conclusion than what was written back [] in

---

[110] Derman Tr. 499–500, 539–40.

[111] *Id*. at 537–38, 506–08 (explaining he "would not have sent it to [Hillblom]" and if it were shared it "would have come from the business line's team members").

[112] *Id*. at 513–14.

[113] *Id*. at 506.

[114] Gallagher Tr. 186–87. Gallagher "was disappointed" but "not surprised" WTC did not respond to the 2016 S&P Offer because he "couldn't get anyone to deal with me. It was very unusual," unlike the early years when S&P and WTC "had open communication." *Id*. at 187.

[115] *Compare* JX 33 *with* JX 44; Derman Tr. 490–91; Gallagher Tr. 188 ("This is basically a regurgitation of Randi Dlott's proposal from three or four years before this. No change, no response, the same mistaken belief that 706 had any reasonable relationship to the value of that asset.").

17

2013."[116] Derman confirmed WTC had done nothing to determine that value.[117] Derman could not explain why the Form 706 valuation was appropriate or required by the Fee Agreement.[118]

The 2017 WTC Offer was accompanied by a check for $79,086.00, the exact figure of the 2013 WTC Offer; the check was drawn from the Trust's principal, endorsed by two WTC representatives, and marked "FINAL PAYMENT ON ARW, LLC."[119] The 2017 WTC Offer relied on the same reasoning undergirding the 2013 WTC Offer, yet did not include any additional interest.[120] Derman explained, "I didn't feel like it made sense to accrue interest based on [S&P's] delay.[121]

WTC did not consult Hillblom before cutting that check from his Trust.[122] Derman testified the Trust Agreement gave WTC authority to pay S&P "an amount that was equal to what was owed by the [Trust]" without involving Hillblom.[123]

---

[116] Derman Tr. 490–91.

[117] *Id*. at 490–91, 500–01, 512.

[118] *Id*. at 532–33 ("Q: Why did you determine that [the Form 706 value] was appropriate for purposes of calculating a fee? A: Because it referred in the document -- in the fee agreement -- actually, let me correct that. I'm not specifically sure. I think it is in the fee agreement, that it specifically spoke about proceeds from the estate. And a way to value an estate is to utilize a 706 valuation, which would be what you would provide the federal government with in terms of telling them what your estate value was at the time of death.").

[119] JX 44 at 3; *see* JX 33.

[120] *Compare* JX 33 at 2 *with* JX 44 1–2.

[121] Derman Tr. 512.

[122] *Id*. at 511.

[123] *Id*.

18

S&P did not deposit the check.[124] S&P rejected the 2017 WTC Offer because it was a mere "regurgitation" of WTC's 2013 Offer and still lacked "any reasonable relationship to the value of th[e] asset."[125] S&P "had enough" of trying to resolve the dispute amicably with WTC, and retained counsel.[126]

### D. S&P Initiates Arbitration Against WTC; WTC Loops In Hillblom.

On June 30, 2017, S&P's counsel, including Axelrod, made an arbitration demand on WTC (the Arbitration Demand") seeking approximately $1.3 million under the Fee Agreement.[127] The Arbitration Demand's cover letter noted that WTC "repeatedly re-affirmed its obligation" under the Fee Agreement, but its conduct revealed "no good faith effort to comply" with that obligation.[128] Gallagher explained he served the arbitration demand on WTC, rather than Hillblom, because he "had no interest in suing [a] client to get money that [he] thought his trust had the obligation to have taken care of."[129] S&P expressed its desire to meet with WTC, hoping the dispute could be resolved without formal arbitration proceedings.[130]

---

[124] Gallagher Tr. 190.

[125] *Id*. at 188.

[126] *Id*. at 190.

[127] JX 46 at 3.

[128] JX 45 at 1.

[129] Gallagher Tr. 192.

[130] JX 45 at 2.

In November, S&P's arbitration counsel contacted WTC, expressing dismay WTC "ha[d] not responded in any way to [] efforts to encourage settlement communication" or to secure the appointment of an arbitrator.[131] WTC blamed its lack of engagement on its inability "over the last several weeks" to reach Hillblom.[132] WTC had never involved Hillblom before, or expressed that it had to involve him. WTC "never [provided] a substantive proposal" following the Arbitration Demand, leaving S&P "to conclude that Wilmington has no intention of settling the dispute and valuation issues."[133]

WTC knew it had to pay S&P's fee from the Trust: the Trust Agreement said so, and WTC had acknowledged that fact many times over the previous two decades.[134] WTC also knew Hillblom had no funds outside his Trust.[135] But it continued to play games with S&P, ducked the arbitration, and sent S&P to sue Hillblom.[136] On December 27, WTC told the arbitrator WTC is "not a party to the Fee Agreement and it has not consented to submit to the court's jurisdiction or to

---

[131] JX 51 at 1.

[132] *Id*.; *see* JX 52 ("[W]e are open to continuing a dialog and will reach out to you if we are able to get in contact with [Hillblom].").

[133] JX 52 at 2–3.

[134] JX 26 at 3; JX 30 at 2; JX 33 at 2–3; JX 38; JX 44.

[135] White Tr. 609.

[136] Gallagher Tr. 193.

arbitrate any issues."[137]  WTC told S&P it "had to sue [Hillblom] directly" because WTC was not a party to the Fee Agreement.[138]  WTC still had not told Hillblom about the ARW fee dispute, much less the 2016 S&P Offer or the Arbitration Demand.[139]

Two weeks later on January 16, 2018, Derman, Kelly White, and three other WTC employees called Hillblom, informing him for the first time there was a chance S&P might sue him for its fees.[140]  Hillblom had never before spoken with so many WTC representatives at once.[141]  WTC explained S&P had demanded WTC pay the

---

[137] JX 53.

[138] Gallagher Tr. 193.

[139] JX 53 at 2 (acknowledging on December 27, 2017, WTC "has not yet succeed[ed] in contacting [Hillblom] with respect to this matter").

[140] JX 54; JX 55; Hillblom Tr. 436–39, 442.

Hillblom's testimony was vivid and shared specific memories of many "firsts." Hillblom Tr. 438.  He was definitive: "I think a lot would be addressed if I could just say I know that I learned about the Sanders & Park[] and  Gallagher situation in full on that [January 2018] phone call . . . . I didn't think it was important."  *Id*. at 457.  In contrast, Derman and White's testimony was muddy and conflicting.  Derman Tr. 518–19; White Tr. 633.  In October 2017, WTC emailed Hillblom "regarding a legal matter relating to your [T]rust's legal fees, that [WTC] would like to run by you."  JX 49 at 1.  WTC and Hillblom had a call on October 31, but Hillblom testified "[n]othing from that call stood out." Hillblom Tr. 455.  Hillblom was emphatic WTC disclosed the nature of S&P's claim on the January 16 conference call.  *Id*. at 457–58; *see id*. at 442 ("Q: Did you understand that at any point prior to this phone call on January 16, 2018, that the law firm was making a claim for attorneys' fees against you personally? A: No -- I knew that they were not. Because I was told they may. . . . Which is a future thing.").  WTC's counsel represented WTC had "not succeed[ed] in contacting [Hillblom] with respect to" S&P's fees as of December 27, 2017.  JX 53 at 2.

[141] Hillblom Tr. 440.

requested fees, but WTC "had dismissed the case."[142]  WTC told Hillblom "[S&P] may look to sue" Hillblom himself.[143]  Hillblom did not recall WTC explaining the nature of S&P's possible claim against him, other than that it related to attorneys' fees.[144]  Based on WTC's explanation, Hillblom believed any claims S&P asserted against him would be "easily dismissible."[145]  He recalled being "so confused why five people had to be on the phone call" because as they explained the situation, "it just seemed like it was no big deal.  [] I couldn't understand the facts of them easily dismissing something like this and the unprecedented nature of the phone call."[146]  Hillblom added the explanation made a potential suit "sound[] like it was a frivolous thing that I didn't need to worry about."[147]  WTC did not share the 2016 S&P Offer with Hillblom.[148]

Hillblom was overcome with "disappointment" and "heartbreak" by S&P's decision to sue him.[149]  S&P, as counsel to Hillblom's guardian Grist, had been a kind and transformational force in his remarkable childhood.  Hillblom was

---

[142] *Id.*

[143] *Id.* at 441; White Tr. 63–34; *see* Derman Tr. 519.

[144] Hillblom Tr. 442.

[145] *Id.* at 440.

[146] *Id.*

[147] *Id.* at 441.

[148] *Id.* at 480–81.

[149] *Id.* at 462–63.

devastated that Grist's attorneys had returned with a hand out, like so many others in Hillblom's life.[150]

On January 19, White sent Hillblom "12 key documents" "concerning the ARW LLC asset and the fee dispute" to assist in his defense (the "2018 Production").[151] The 2018 Production included the 2013 WTC Offer and the 2017 WTC Offer, but did not include the 2016 S&P Offer or any documents referencing it.[152] Derman's team compiled the 2018 Production, but on the stand, Derman deflected responsibility to White's team as the "business line."[153] White's email also included a list of law firms "in the event [Hillblom] independently wish[ed] to start an evaluation process for an attorney."[154]

---

[150] *Id*. at 440, 462–63.

[151] JX 56; White Tr. 638–39 ("Q: Why was Wilmington Trust sending Mr. Hillblom documents that it thought he and his attorneys would need in connection with the legal dispute relating to ARW? A: Because, as Neil Derman conveyed to [Hillblom], he was -- he had to defend this matter or, you know, work through this matter himself as opposed to the trustee of his trust. So he needed that documentation, he needed to get counsel, and he needed to give the documentation to his counsel.").

[152] JX 56 at 19–20, 23–25; MSJ BR at 16 (noting the undisputed fact that the 2018 Production did not include or reference the December 2016 Offer).

[153] White Tr. 648–49; JX 56 (White informing Hillblom "I've received communications and documents from our Legal group, that they've asked me to forward to you."); Derman Tr. 518–19, 562.

[154] JX 56 at 1.

## E.     S&P Files Arbitration Complaint Against Hillblom.

In February 2019, S&P reluctantly filed its arbitration complaint for its ARW fee (the "Arbitration Complaint") against Hillblom.[155]  By July, Hillblom retained David Ribakoff as counsel.[156]  Hillblom found Ribakoff by searching for an attorney located in Century City, California, based on his view that it is "the nicest area" of Los Angeles with the "best of everything," including legal professionals.[157]  Ribakoff asked WTC for "whatever non-privileged documents you have concerning the [S&P] Attorneys' claims."[158]  On August 5, WTC's litigation counsel responded with five documents WTC "authorized" him to provide.[159]  WTC's August production failed to disclose the 2016 S&P Offer or any documents discussing that offer.[160]

On September 7, Hillblom was served with S&P's Arbitration Complaint.[161] It alleged:

- "[Hillblom], directly and through his agent, [WTC], has breached the Fee Agreement by failing and refusing to pay to [S&P] the Contingent Fee earned on the value of certain assets and

---

[155] PTO ¶ 44; JX 57; Gallagher Tr. 193.

[156] Ribakoff Tr. 5.

[157] Hillblom Tr. 467.

[158] JX 59 at 2.

[159] *Id*. at 1, 4–25.

[160] *See generally* JX 59.

[161] PTO ¶ 45.

distributions received by [Hillblom], through the Lory Trust, from the Estate."[162]

- "[WTC], acting as [Hillblom]'s agent, repeatedly asked [S&P] to defer its receipt of payment attributable to the ARW asset and distributions between 2010 and 2017 . . . . [WTC's] conduct has increased the damages incurred by [S&P] and now owed to [S&P] by [Hillblom]."[163]

- "[WTC] breached [Hillblom's] performance under the Fee Agreement when it asserted in bad faith that [WTC] would pay [S&P] based only upon a 1995 valuation of a former ARW LLC . . . ."[164]

- "[Hillblom] directly and through his designated agent, [WTC], breached the Fee Agreement."[165]

### F.    WTC Sends Hillblom Documents In September 2019.

On September 5, Hillblom emailed WTC and WTC's litigation counsel requesting "a conference call in regards to the Gallagher situation."[166]  Hillblom explained he and his attorney "would like to discuss and request some information before [Ribakoff] reaches out to [S&P's] legal team."[167]  That conference call occurred on September 17.[168]

---

[162] JX 57 ¶ 8.

[163] *Id.* ¶ 13.

[164] *Id.* ¶ 14.

[165] *Id.* ¶ 16.

[166] JX 61.

[167] *Id.*

[168] JX 62.

25

On September 26, WTC's litigation counsel emailed Ribakoff seven documents "as a courtesy to you and to [Hillblom]" (the "September 2019 Production").[169] The September 2019 Production was simply a partial reproduction of WTC's 2018 Production.[170] It did not disclose the 2016 S&P Offer.[171]

The September 2019 Production comprised the following documents:

1. Grist's October 2002 letter to Gallagher claiming S&P is entitled to "thirty percent of the fair market value of ARW on the date it was distributed to Lory."[172] Grist notes that while he is "certain that a valuation was assigned to the Estate's interest in ARW on the 706 Tax Return [] I would not readily concede that that figure is one we should rely on, whatever it is."[173]

2. The 2013 WTC Offer, which relies on the Form 706 and offers $79,086.[174] The 2013 WTC Offer alternatively proposes the possibility S&P and WTC retain a valuation profession to appraise ARW at the time it was distributed to the Trust.[175]

3. WTC's May 2017 Offer, which reiterates use of the Form 706 value and includes a $79,086 check for "FINAL PAYMENT ON ARW, LLC".[176]

4. Axelrod's letter dated June 30, 2017, asserting "Wilmington's current interpretation of the Fee Agreement is wrong."[177]

---

[169] JX 63.

[170] *Compare* JX 63 *with* JX 56.

[171] JX 63; *see* JX 39.

[172] JX 63 at 2.

[173] *Id*. at 3.

[174] *Id*. at 4.

[175] *Id*. at 5.

[176] *Id*. at 7–9.

[177] *Id*. at 10.

5. S&P's Arbitration Demand directed to WTC, also dated June 30, 2017.[178] The Arbitration Demand notes under the Fee Agreement the "basic fee obligation" is Hillblom's "direct responsibility" since he reached the age of majority.[179] The demand explains WTC is "authorized to honor and perform" Hillblom's obligation under the Trust Agreement and indeed has done so "as [Hillblom's] authorized representative in these respects for many years."[180] The demand claims WTC breached the Fee Agreement by failing to satisfy the Trust's obligations to S&P. S&P's Arbitration Demand seeks approximately $1.3 million in fees related to ARW distributions, prejudgment interest on the ARW distributions, and prejudgment interest on one other non-cash asset.[181]

6. Axelrod's December 2017 letter to the arbitrator.[182] The letter informs the arbitrator that Hillblom has reached the age of majority, and that WTC has represented Hillblom "in matters pertaining to [the] [F]ee [A]greement" since the probate proceeding closed.[183] Axelrod's letter states "[t]he principal disputed issue is likely to be the value of Mr. Lory's (or his Trust's) interest in a minority interest in . . . ARW, LLC."[184]

7. A December 27, 2017 letter from WTC's litigation counsel to the arbitrator explaining WTC is not a party to the Fee Agreement and "has not consented to submit to the court's jurisdiction or to arbitrate any issues."[185] The letter also notes "[w]e are not aware of any information which obligates the Lory Trust to defend the claims alleged by the Contingent Fee Attorneys or to participate in any arbitration process."[186] The letter concludes by noting

---

[178] *Id.* at 12–15.

[179] *Id.* at 12.

[180] *Id.* at 12–13.

[181] *Id.* at 14.

[182] *Id.* at 16–18.

[183] *Id.* at 16.

[184] *Id.* at 17 ("I say 'likely,' because Wilmington has not formally provided an Answer to the demand for arbitration despite the passage of many months.").

[185] *Id.* at 19–20.

[186] *Id.* at 19.

WTC "has not succeed[ed] in contacting Mr. Lory with respect to this matter."[187]

After Hillblom received the Arbitration Complaint and the September 2019 Production, he expected Ribakoff and WTC would work together to protect his interests.[188] He did not anticipate bringing suit against WTC at that time.[189] Ribakoff also believed he and WTC "we[re] on the same team" in terms of protecting Hillblom's interests.[190] Ribakoff explained he was "viewing [WTC] as being a fiduciary to [Hillblom] and . . . equally interested as I was in supporting [Hillblom] . . . in defending himself."[191]

Ribakoff launched into action. On October 2, he informed S&P's arbitration counsel and the arbitrator that Hillblom did not consent to arbitration.[192] He pressed that Hillblom was a minor for most of the dispute, with "no ability to perform under the [F]ee [A]greement."[193] Ribakoff also emphasized the inherent unfairness of forcing Hillblom to participate in a dispute "between competing fiduciaries—his

---

[187] *Id*. at 20.

[188] Hillblom Tr. 476.

[189] *Id*. at 477.

[190] Ribakoff Tr. 66.

[191] *Id*.

[192] JX 64.

[193] *Id*. at 1.

Guardian ad Litem's attorneys and his Trustee—which he had no control over."[194] S&P responded: "While we can agree with you that Mr. [] Hillblom was not well served by his trustee and may well have claims against the trustee for its negligent handling of this matter and potential breaches of its fiduciary duties during the period before the trustee disclaim both responsibility and authority to act, that is not a matter relevant to my clients' breach of contract claims, and is certainly no defense."[195]

In November, Ribakoff met with Gallagher to better understand S&P's claim for ARW fees.[196] After that meeting, S&P shared its "archive records of communications with Grist or WTC [since] the time of the distribution of ARW LLC" to the Trust.[197] That production included the 2016 S&P Offer.[198] That is how Hillblom learned S&P had offered to settle the dispute for $300,000.00.[199]

Gallagher's trove of records was magnitudes larger than WTC's September 2019 Production and 2018 Production.[200] S&P asked Ribakoff to join their efforts

---

[194] *Id*. at 3.

[195] JX 65 at 1–2.

[196] Gallagher Tr. 242; Ribakoff Tr. 27.

[197] JX 67 at 1.

[198] *Id*. at 147–48.

[199] Hillblom Tr. 480–81.

[200] JX 56 at 3 (listing the table of contents of the 2018 Production); *see, e.g.*, JX 67 at 7–11 (November 2004 email from Gallagher to WTC noting ARW has $500,000 to distribute); *id.* at 13 (October 2005 email from Gallagher to Grist noting a "need to get moving" on resolving the fee dispute); *id.* at 14–16 (October 2005 email from ARW's manager to its

in requesting WTC's ARW financial records, explaining "[c]o-operation can't be something [WTC] would complain about," and contemplating ARW's financials would "provide a sound basis to resolve this case without a formal arbitration."[201]

In early 2020, Hillblom moved to dismiss the Arbitration Complaint for failure to join WTC as an indispensable party.[202] S&P resisted, and the arbitrator denied that motion.[203] S&P and Ribakoff prepared for arbitration and kept working to find an amicable resolution.[204] Ribakoff presented WTC with a subpoena and

---

members explaining it had received an offer to acquire ARW's interest in Davenport and Madison for approximately $5 million); *id.* at 17 (January 2009 email from WTC to ARW explaining ARW's interests in Davenport and Madison are worth between $7 million and $8 million); *id.* at 19 (November 2012 email from Gallagher to Grist requesting a list of distributions from ARW to the Trust); *id.* at 28 (September 2012 email from WTC to Gallagher where WTC noted "we are [] trying to work through the fee on ARW, LLC so we can wrap up the fee arrangement with you do this does not continue to drag on"); *id.* at 33 (November 2012 email from Patni to Gallagher noting "I cannot tell you why the fee on ARW was not addressed sooner"); *id.* at 38 (January 2013 email from Gallagher to WTC requesting a schedule of ARW's distributions to the Trust); *id.* at 50 (June 2013 email from Gallagher to WTC regarding ARW fees); *id.* at 52–53 (August 2013 email from WTC to Gallagher noting "[w]e are aware we have not yet compensated you for your services on ARW and are internally discussing a proposed resolution"); *id.* at 55 (October 2013 email from ARW to Gallagher providing a list of ARW's cash distributions to the Trust); *id.* at 65–84 (Madison's financial records for fiscal year 2010); *id.* at 89–90 (October 2013 letter from Axelrod to WTC explaining how his firm was compensated on the interim cash distributions from ARW); *id.* at 91–92 (October 2013 letter to WTC from the attorney who represented the Estate during the probate proceeding explaining during the allocation of non-cash assets "ARW was one of the assets where the parties did not agree on a value"); and *id.* at 147–48 (the 2016 S&P Offer).

[201] JX 67 at 1.

[202] JX 78.

[203] JX 77; JX 82.

[204] *E.g.*, JX 88; JX 92.

asked it to accept informal service, which WTC did.[205]  S&P and Ribakoff each engaged valuation experts to ascertain ARW's value and to assess S&P's claim.[206]

In November, S&P offered to settle its claim for ARW fees for $1,846,000.[207] Ribakoff immediately contacted Derman.  Ribakoff proposed that Hillblom pay $300,000 and WTC pay the rest, on the basis WTC could have settled for $300,000 in 2016.[208]  WTC responded a week later with a punt: "we need to have further discussion with the business [team] and [] that takes time."[209]

In the meantime, Ribakoff asked a valuation expert he trusted from earlier work, Stefano Vranca, to review S&P's expert report and opine on a reasonable settlement figure.[210]  Vranca gave Ribakoff his criticism of the methodology deployed and suggested a reasonable settlement would be in the range of $1,500,000 to $1,579,500.[211]

In December, Ribakoff counteroffered $1,325,000, and pointed out Hillblom could assert a statute of limitations defense given S&P's claim arose in 2002.[212]  On

---

[205] JX 79; Derman Tr. 521–22.

[206] JX 92; JX 100; JX 98.

[207] JX 92.

[208] *Id.*

[209] JX 96 at 1.

[210] Vranca Tr. 285–88; JX 100; *see* JX 124 at 31–70.

[211] JX 100 at 3–4.

[212] JX 101 at 1.

December 17, S&P and Hillblom agreed to settle S&P's claims for $1.4 million—$1.1 million more than the 2016 S&P Offer.[213]  Hillblom paid that amount from the Trust.[214]

### G.  Procedural History

On November 29, 2021, Hillblom filed his Verified Complaint for breach of fiduciary duty and breach of trust against WTC (the "Complaint").[215]  When unpacked, the Complaint's two counts assert five claims: (i) breach of fiduciary duty and breach of trust for failure to accept the 2016 S&P Offer ( "Failure to Pay Claim"); (ii) breach of fiduciary duty and breach of trust for failure to inform Hillblom of the 2016 S&P Offer ("Failure to Disclose Claim"); (iii) breach of fiduciary duty for claiming WTC was not subject to arbitration under the Fee Agreement ("Avoiding Arbitration Claim"); (iv) breach of fiduciary duty for failing to provide Hillblom meaningful assistance in arbitration ("Failure to Assist Claim"); and (v) breach of trust for failing to pay the fees owed to S&P under the Fee Agreement ("Failure to Pay Claim").[216]

---

[213] PTO ¶ 48; JX 102 (noting settlement payment in the amount of $1,400,000); *see* JX 39 (offering to resolve S&P's claim to ARW fees for $300,000).

[214] Derman Tr. 522 (explaining the "business line" approved the use of Trust funds to settle S&P's claim against Hillblom).

[215] *See generally* Compl.

[216] *Id*. ¶¶ 57–64.  The "breach of trust claim for failure to accept the [2016 S&P Offer] is legally identical to the breach of fiduciary duty claim for failing to accept the December

WTC moved to dismiss the complaint, arguing, among other things, it did not owe a fiduciary duty to pay S&P's fees under the Fee Agreement, and that the claims should be barred under the doctrine of laches.[217] I denied that motion.[218]

WTC answered the Complaint[219] and moved for summary judgment.[220] That motion was granted as to the Avoiding Arbitration Claim and the Failure to Assist Claim; it was otherwise denied.[221] Relevant here, WTC argued many of Hillblom's claims were time-barred under 12 *Del. C.* § 3585(a), pressing the 2018 Production had put Hillblom on inquiry notice of his claims against WTC.[222] I rejected this argument, concluding the 2018 Production provided Hillblom "no reason to distrust or otherwise be suspicious of WTC" and "did not provide sufficient information such that Hillblom reasonably should have inquired into a claim against WTC for failing to accept [the 2016 S&P Offer] or notify Hillblom of it."[223]

The parties undertook additional fact discovery into a record spanning thirty years and two continents, and largely predating modern electronic storage

---

2016 Offer." *Hillblom v. Wilmington Tr. Co.*, 2022 WL 17428978, at *10 (Del. Ch. Dec. 6, 2022).

[217] D.I. 12 at 13–14.

[218] *Hillblom*, 2022 WL 17428978, at *12.

[219] D.I. 61.

[220] D.I. 62.

[221] MSJ BR at 25–26.

[222] D.I. 63 at 16–24; MSJ BR at 11–12.

[223] MSJ BR at 16.

technology.[224]  In May 2025, after Ribakoff was listed as a trial witness, WTC moved to disqualify him as Hillblom's trial counsel.[225]  I denied that motion due to lack of prejudice to WTC.[226]

Hillblom's breach of fiduciary duty and breach of trust claims were tried over three days in July 2025.[227]  The parties submitted post-trial briefing,[228] and presented post-trial argument on December 8, at which point I took the matter under advisement.[229]

## II.    ANALYSIS

The preponderance of the evidence shows WTC breached its fiduciary duties to Hillblom.  WTC does not dispute that it owed fiduciary duties, the contractual and fiduciary duty to pay S&P a fee on ARW from the Trust, and the duty to tell Hillblom about the 2016 S&P Offer.[230]  WTC does not dispute that it left S&P's fee unpaid for

---

[224] D.I. 107; D.I 108; D.I. 110; D.I. 115; D.I. 117.

[225] D.I. 136; *see* D.I. 139; D.I. 140; D.I. 141; D.I. 143.

[226] *Hillblom v. Wilmington Tr. Co.*, 339 A.3d 753, 756–57 (Del. Ch. 2025); D.I. 147.

[227] D.I. 160.

[228] POB; DAB; PRB.

[229] D.I. 180; *see* D.I. 181.

[230] *E.g.*, JX 26; JX 27; JX 30; JX 32; JX 33; Derman Tr. 503–04; Dlott Tr. 588–90, 595–96 ("We had a fiduciary duty to decide if it was appropriate to pay Garrick Gallagher.").

nearly twenty years, left Hillblom to defend S&P's claims himself, and left Hillblom in the dark about the 2016 S&P Offer.[231]

Against that backdrop, WTC had few defenses. At trial, WTC attempted to discredit and blame its beneficiary by dredging up personal struggles Hillblom has worked to overcome.[232] On the merits, WTC leads with a specific timeliness defense: it asserts Section 3585's one-year statute of limitations bars Hillblom's claims.[233] It claims the September 2019 Production put Hillblom on inquiry notice of his claims against WTC.[234] WTC more broadly contends Hillblom's claims fail because WTC did not act in bad faith.[235] WTC contends Hillblom waived his Failure to Pay Claims.[236] Finally, WTC argues Hillblom cannot recover the $1.4 million because that amount is "not tethered to any valuation of ARW at the time of the alleged breach of the Fee Agreement in 2000."[237] None of these arguments succeed.

---

[231] Dlott Tr. 595–96; Derman Tr. 537–39; *see* JX 53.

[232] Hillblom Tr. 443–44 (inquiring into irrelevant personal struggles); *id*. at 446–47 (same); *id*. at 450–54 (invoking those struggles); *id*. at 456–58 (implying Hillblom knew about the fee dispute before January 2018 but was unable to comprehend or retain that information).

[233] *See generally* DAB.

[234] *Id*.

[235] *Id*. at 47–48.

[236] *Id*. at 46.

[237] *Id*. at 52–53.

## A. WTC Breached Its Fiduciary Duties In Bad Faith.

The preponderance of the evidence shows WTC breached its duties to administer the Trust in accordance with common law fiduciary duties and the Trust Agreement.

"The elements of a claim for breach of fiduciary duty are: (i) that a fiduciary duty exists; and (ii) that a fiduciary breached that duty."[238] "Under default principles of Delaware law, a trustee owes fiduciary duties to a beneficiary."[239] "At common law, the duties of a trustee to trust beneficiaries include loyalty, good faith, and due care."[240]

A trustee's fiduciary duties include the overarching duty to preserve trust property.[241] At common law, a trustee has the duty to take reasonable steps to

---

[238] *Hardy v. Hardy*, 2014 WL 3736331, at *11 (Del. Ch. July 29, 2014) (citing *Heller v. Kiernan*, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002)), *aff'd*, 806 A.2d 164 (Del. 2002).

[239] *Tigani v. Tigani*, 2021 WL 1197576, at *13 (Del. Ch. Mar. 30, 2021), *aff'd*, 271 A.3d 741 (Del. 2022) (TABLE); *see* 12 *Del. C.* §§ 3301(d)–(h)(2)(a).

[240] *In re Nat'l Collegiate Student Loan Trs. Litig.*, 251 A.3d 116, 185 (Del. Ch. 2020) (citations and quotations omitted); *see Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1148 (Del. Ch. 1994), *aff'd*, 663 A.2d 1156 (Del. 1995).

[241] Restatement (Third) of Trusts § 76 cmt. d (2007); *id*. § 77 cmt. a ("In matters relating to the administration of the trust, the trustee has a duty to exercise prudence—that is, to act with care, skill, and caution []—as well as a duty to adhere to the other fiduciary standards . . . ."); *see Frederick-Conaway v. Baird*, 159 A.3d 285, 299 n.52 (Del. 2017) ("This Court has looked to the Restatement (Third) of Trusts for guidance on other areas of trust law."); *see also Otto v. Gore*, 45 A.3d 120, 130 (Del. 2012); *Law v. Law*, 753 A.2d 443, 448 (Del. 2000).

36

"defend actions which may result in a loss to the trust estate."[242] The exercise of that duty includes promptly acting on remunerative offers,[243] and "not resisting an unenforceable claim if the costs and risk of litigation make such a decision reasonable under all the circumstances."[244]

A trustee also has the duty to inform the beneficiary of certain matters relating to the trust.[245] That duty creates "an affirmative obligation" and duty that a trustee

[242] *See* Restatement (Second) of Trusts § 178 (1959); *id.* at cmt. b ("If it reasonably appears to be for the benefit of the beneficiary, the trustee can properly compromise or arbitrate such claims."); *id*. § 192 ("The trustee can properly compromise, submit to arbitration or abandon claims affecting the trust property, provided that in so doing he exercises reasonable prudence."); Restatement (Third) of Trusts § 76 cmt. d (2007) ("The duty of protecting the trust estate includes taking reasonable steps to enforce or realize on other claims held by the trust and to defend actions that may result in a loss to the trust estate. Reasonable steps may include . . . compromise or arbitration of claims by or against the trust . . . ."); *see also Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1113 n.68 (Del. Ch. 2008) (recognizing a trustee's duty "to defend actions").

[243] *Pennsylvania Co. v. Wilmington Tr. Co*., 186 A.2d 751, 777, 781–82 (Del. Ch. 1962).

[244] Restatement (Third) of Trusts § 76 cmt. d (2007); *see id*. § 88 cmt. b ("A trustee is not limited to incurring expenses that are 'necessary' or essential, but may incur expenses that, in the exercise of fiduciary judgment, are reasonable and appropriate in carrying out the purposes of the trust, serving the interests of the beneficiaries, and generally performing the functions and responsibilities of the trusteeship. For example, the trustee can properly incur expenses appropriate to the collection and protection of the trust property."); *id.* at cmt. a ("The comprehensive powers of a trustee include the power to incur and pay expenses in the course of trust administration, but the exercise of this power is subject to the trustee's fiduciary duties. Implicit in a trustee's fiduciary duties is a duty to be cost-conscious.").

[245] *Cygnus Opportunity Fund, LLC v. Washington Prime Grp., LLC*, 302 A.3d 430, 450 (Del. Ch. 2023) ("The obligation to keep beneficiaries informed is a central aspect of the trustee's duties at common law."); *McNeil v. McNeil*, 798 A.2d 503, 509–10 (Del. 2002); *NHB Advisors, Inc. v. Monroe Cap. LLC*, 2013 WL 6906234, at *4 (Del. Ch. Dec. 27, 2013); *see* Restatement (Third) of Trusts § 82(1)(c) (2007); *id.* § 82 cmt. d ("For various reasons of prudence, loyalty, or impartiality, or simply as a general matter of proper

"furnish information" to its beneficiary.[246]  A trustee owes a duty to inform its beneficiary "of significant developments concerning the trust and its administration, particularly material information needed by beneficiaries for the protection of their interests."[247]  "A trustee has a duty to furnish information to a beneficiary upon reasonable request."[248]  And where "a fiduciary chooses to speak [it] must do so candidly and completely."[249]

"A violation by a trustee of a duty the trustee owes to a beneficiary is a breach of trust."[250]  A breach of trust by a trustee violates "a correlative right of the beneficiary, and gives rise to liability on the part of the trustee and a correlative cause of action on the part of the beneficiary for any loss to the trust estate.  Th[at] rule is

---

disclosure . . . a trustee's duty to provide information to beneficiaries may apply when there are . . . developments of which beneficiaries should be made aware and thereby allowed an opportunity to offer suggestions, comments, or information . . . .");  George G. Bogert et al., *Bogert's The Law of Trusts and Trustees* § 962 (3d. ed.), Westlaw (database updated May 2026) [hereinafter "*Bogert's*"] ("[T]he trustee is under a duty, independent from the duty of care, to inform the beneficiary of important matters concerning the trust . . . .").

[246] *In re Thomas Lawrence Reeves Irrevocable Tr.*, 2015 WL 1947360, at *9 (Del. Ch. Apr. 29, 2015);  *McNeil*, 798 A.2d at 509 ("The duties to furnish information and to act impartially are not subspecies of the duty of care, but separate duties." (citing Restatement (Second) of Trusts §§ 173, 174, 183 (1959))).

[247] Restatement (Third) of Trusts § 82(1)(c) (2007); *accord Cygnus*, 302 A.3d at 450; *McNeil*, 798 A.2d at 509; *see Globe Woolen Co. v. Utica Gas & Elec. Co.*, 121 N.E. 378 (N.Y. 1918) ("A beneficiary, about to plunge into a ruinous course of dealing, may be betrayed by silence as well as by the spoken word.") (Cardozo, J.).

[248]  *McNeil*, 798 A.2d at 510.

[249] *Cygnus*, 302 A.3d at 451.

[250] 12 *Del. C.* § 3581(a).

38

applicable to positive acts, as well as omissions or negligence which constitute a breach of duty by the trustee."[251]

"A trust agreement may 'expand, restrict, eliminate, or otherwise vary' a fiduciary's duties."[252] A trust agreement may differentiate between discretionary and mandatory powers.[253] A mandatory power is generally indicated by the use of terms "shall," or "must."[254] Where a power is mandatory, "the trust has a positive duty to exercise power by performing the act in question, although the exact time and manner of performance is [] left to the judgement of the trustee."[255]

The trust agreement's terms also delineate the trustee's affirmative duty to administer the trust in accordance with those terms.[256] A trustee breaches the duty of trust where it "improperly fail[s] to act" consistent with the terms of the trust

---

[251] *Hogg v. Walker*, 622 A.2d 648, 653 (Del. 1993) (footnote omitted).

[252] *Hillblom*, 2022 WL 17428978, at *8 (quoting 12 *Del. C.* § 3303(a)).

[253] *Bogert's* § 552; *see* Restatement (Third) of Trusts § 76 cmt. b (2007) ("A trustee has both (i) a duty generally to comply with the terms of the trust and (ii) a duty to comply with the mandates of trust law except as permissibly modified by the terms of the trust.").

[254] *Bogert's* § 552.

[255] *Id.*

[256] Restatement (Third) of Trusts § 76 (2007).

agreement.[257] In construing trust agreements, "[t]he language of the entire instrument, rather than any isolated Article" dictates its interpretation.[258]

Here, Hillblom's Trust Agreement does not disclaim any duties; rather, it reinforces that WTC as trustee is "subject always to the obligations of a fiduciary."[259] It enumerates several specific mandatory powers WTC must exercise in its faithful and informed discretion. It enumerates the mandatory power to use Trust assets to pay debts related to the Estate's probate proceedings, specifically including S&P's fee.[260] And it grants the mandatory power to "pay or contest any claim," to settle a claim against the Trust, and to "defend actions, claims, or proceedings for the protection of [T]rust assets."[261]

WTC did not satisfy those obligations at all, much less with the care and fidelity expected of a fiduciary. WTC did not pay S&P's ARW fee. WTC did not pay S&P's claim.[262] WTC did not contest or defend against S&P's claim: it let the

---

[257] *Id*. § 76 cmt. b.

[258] *Dickinson v. Wilmington Tr. Co.*, 734 A.2d 605, 609 (Del. Ch. 1999]) (*quoting J.P. Morgan Delaware v. Henley-Paradis*, 1993 WL 6866, at *3 (Del. Ch. Jan. 13, 1993)), *aff'd sub nom. Wilmington Tr. Co. v. Dickinson*, 734 A.2d 642 (Del. 1999).

[259] JX 5 § B, Art. II ¶ A (1); *see id*. § B, Art. II ¶ B (1); *Hillblom*, 2022 WL 17428978, at *8.

[260] JX 5 § A, Art. III ¶ F.

[261] *Id*. § B, Art. II ¶ A (19).

[262] *Hillblom*, 2022 WL 17428978, at *8–9 (holding S&P's demand for payment constitutes a "claim" under Section 19 of the Trust Agreement).

matter languish for decades, ducked S&P's claim in arbitration, then left Hillblom to do the defending. WTC did not preserve the Trust corpus: due to WTC's abdication of its duties and refusal to engage with S&P, the valuation of the Trust's ARW stake, and the 2016 S&P Offer, the Trust had to pay five times the 2016 S&P Offer.[263]

And WTC failed to give Hillblom the information to which he was entitled at every opportunity: when the dispute was unfolding, when WTC received and rejected the 2016 S&P Offer, when WTC left Hillblom to manage his own defense, and when Hillblom and Ribakoff asked WTC for information.[264] WTC chose to speak when it offered Hillblom the 2018 Production, which it described as the "12 key documents and correspondence that you and your attorney will need"—but WTC omitted the 2016 S&P Offer.[265] WTC omitted it again when Ribakoff asked for "whatever non-privileged documents you have" after Hillblom was sued, and yet again in the September 2019 Production when WTC chose to speak "as a courtesy" to its beneficiary.[266]

---

[263] *Compare* JX 102 *with* JX 39.

[264] Dearman Tr. 507–08, 537–39; JX 56; JX 59; JX 61; JX 63.

[265] JX 56 at 1.

[266] JX 59 at 2; JX 63.

WTC clings to the discretion afforded to a fiduciary in performing its duties, arguing it was within its discretion to refuse to overpay S&P.[267] That is so. But the grant of discretion to a trustee "may not relieve the trustee of liability for imprudent exercises of [its] fiduciary powers."[268] WTC simply failed to pay, defend, and inform as the Trust Agreement and common law fiduciary duties required. Those failures fell outside the range of discretion: they were in bad faith.

A trustee acts in bad faith when it "consciously and intentionally disregard[s] [its] responsibilities" in the face of a known obligation.[269] Put differently, a trustee acts in bad faith where "a known obligation" arises and it willfully abdicates "that well-understood duty."[270]

WTC persistently acknowledged its obligation to pay S&P's fee.[271] WTC knew it should have disclosed the 2016 S&P Offer when it was received.[272] WTC knew that ARW was difficult to value when it was distributed to the Trust, that

---

[267] DAB at 47–48.

[268] *Bogert's* § 542; *see McNeil*, 798 A.2d at 509–10.

[269] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 62 (Del. 2006) (quoting *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 289 (Del. Ch. 2003)); *In re Volftsun/Landy Tr. Litig.*, C.A. No. 4635-VCL, at 721 (Del. Ch. Oct. 24, 2012) (TRANSCRIPT) (finding trustee acted in bad faith where "there was a known obligation to manage and a[n] abdication of that well-understood duty").

[270] *Volftsun/Landy*, C.A. No. 4635-VCL, at 721.

[271] *E.g.,* JX 26; JX 27; JX 30; JX 32; JX 33; JX 56 at 28, 33, 52–53; Derman Tr. 503–04; Dlott Tr. 588–90.

[272] Derman Tr. 499–500, 539–40.

attorneys with a "substantially similar" fee agreement were paid on cash distributions, that the value assigned on the Form 706 was not particularly useful, and that one of its representatives valued ARW's 2.5% stake in Madison at approximately $7 million in 2006.[273] Yet WTC only offered S&P a fee based on the Form 706 value and did nothing to value the asset.[274] Late in the game, WTC blamed its inaction on its inability to reach Hillblom, but WTC had the authority to resolve the issue without him, and indeed cut the 2016 check without his input.[275] Put simply, WTC knew it could, and should, pay S&P a fee based on a different valuation of the ARW asset, and that it should have informed Hillblom of the 2016 S&P Offer. But WTC did the opposite: it left the S&P fee unresolved without any valuation work; did not accept or act on the 2016 S&P Offer; did not defend S&P's claim, leaving S&P to sue Hillblom; and did not tell Hillblom about the 2016 S&P

---

[273] JX 67 at 85–87, 64 (William Pease from Wilmington Trust noting in 2006 that "two minority partners wanted $8 million per 2.5% interest, and I would have been happy with $7 million"); JX 129 (explaining that another heir's attorneys were paid on the cash distributions from ARW); JX 67 at 91–92 (counsel to Larry's charitable trust informing WTC in 2013 that "ARW was one of the assets where the parties did not agree on a value"); JX 30 at 2; JX 32 at 2 (WTC noting the difficulty in "retroactively" valuing the Trust's interest in ARW); JX 33 at 2 (suggesting the possibility of retaining a valuation firm to ascertain the value of the FMW of ARW when distributed to the Trust).

[274] Dlott Tr. 579, 584, 594–96 (acknowledging WTC never commissioned an appraisal of the Trust's interest in ARW); id. at 597 ("Q: And you never had the benefit of a fair market value appraisal; correct? A. No. We didn't have a copy of the appraisal that was attached to the estate tax return, nor did Mr. Gallagher provide it."); JX 33; JX 44.

[275] Dlott Tr. 591; JX 44; JX 52 at 1; Derman Tr. 540–42; JX 96; see JX 103.

Offer at any time, including when it chose to speak on the issue and when Hillblom asked for information. Those knowing breaches were in bad faith.[276]

### B.    Hillblom's Claims Are Not Time Barred.

WTC argues Hillblom's claims are time-barred because the September 2019 Production is a "report" under 12 *Del. C.* § 3585 that put Hillblom on reasonable inquiry notice of claims against WTC, and started a one-year period that expired before Hillblom sued.[277]

Section 3585 provides that if a "report" provides a beneficiary either actual or reasonable inquiry notice of a claim against a trustee, the action must be filed within one year.[278] It reads, in relevant part:

> (a) A person may initiate a judicial proceeding against a trustee for breach of trust or other claim until the first to occur of:
>     (1) One year after the date the person was sent a report that adequately disclosed the facts constituting a claim . . . .
> (b) For the purpose of subsection (a) of this section, a report adequately discloses the facts constituting a claim if it provides sufficient information so that the person knows of the claim or reasonably should have inquired into its existence.[279]

---

[276] *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008) ("[F]rom the sphere of actions that was once classified as grossly negligent conduct that gives rise to a violation of the duty of care, the Court has carved out one specific type of conduct—the intentional dereliction of duty or the conscious disregard for one's responsibilities—and redefined it as bad faith conduct, which results in a breach of the duty of loyalty."); *Bogert's* § 542 ("Actions taken in reckless disregard of the beneficiaries' interests have been held to indicate bad faith and result in refusal to apply the exculpatory clause.").

[277] DAB at 23–44.

[278] 12 *Del. C.* § 3535.

[279] *Id.* §§ 3535(a)–(b).

Subsection (b) is triggered by inquiry notice.[280]  A plaintiff is deemed "to have inquiry notice upon the discovery of facts constituting a basis for the cause of action, or [where the party] knows facts sufficient to put a person of ordinary intelligence and prudence on inquiry, which, if pursued, would lead to the discovery of such facts."[281]  Inquiry notice requires a plaintiff to be "objectively aware of the facts giving rise to the wrong[.]"[282]  A plaintiff is deemed to be on inquiry notice when "the information underlying [the] claim is readily available."[283]  This Court regularly declines to find inquiry notice where a plaintiff would have to piece together information from various documents, reasoning "[s]uch an investigation is beyond 'reasonable' diligence."[284]

---

[280] *Id.* § 3535(b) (starting the one-year period after the person was sent a report that "provides sufficient information so that the person . . .  reasonably should have inquired into [the claim's] existence").

[281] *Altenbaugh v. Benchmark Builders Inc.*, 271 A.3d 188, *2 (Del. 2022) (TABLE) (internal quotations omitted and alterations in original); *Coleman v. PricewaterhouseCoopers, LLC*, 854 A.2d 838, 842 (Del. 2004); *Becker v. Hamada, Inc.*, 455 A.2d 353, 356 (Del. 1982).

[282] *Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008).

[283] *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *8 (Del. Ch. Jul. 17, 1998), *aff'd*, 725 A.2d 441 (Del. 1999); *see Pomeranz v. Museum P'rs, L.P.*, 2005 WL 217039, at *12 (Del. Ch. Jan. 24, 2005) ("[Plaintiffs] may not simply wait until the details of the harm are provided to them before the statute begins to run. Knowing of a wrong is sufficient to require action to preserve one's rights.").

[284] *Weiss*, 948 A.2d at 452; *Microsoft Corp. v. Amphus, Inc.*, 2013 WL 5899003, at *19 (Del. Ch. Oct. 31, 2013).

45

Section 3585's inquiry notice trigger has a reasonableness modifier.[285]  As explained on WTC's motion for summary judgment, that modifier "requires an objective consideration of the circumstances."[286]  Black's Law Dictionary defines the term "reasonable" as "fair and proper under the circumstances."[287]  Our Supreme Court has embraced that approach in the context of claims brought by a lay client against a trusted professional, repeatedly noting inquiry notice turns on the unique facts and circumstances of the case.[288]

---

[285] 12 *Del. C.* § 3535(b).

[286] MSJ BR at 12.

[287] REASONABLE, Black's Law Dictionary (12th ed. 2024) ("Reflecting good judgment; fair and proper *under the circumstances*; sensible." (emphasis added)); Kenneth Adams, *A Manual of Style for Contract Drafting* § 13.681 (4th ed.) ("A reasonableness standard is objective—what would a reasonable person have done in the circumstances?"); *see also Willey v. State*, 1985 WL 189319, at *2 (Del. Super. Nov. 26, 1985) ("[Section 2322(a) of Title 19] obligates an employer to provide reasonable medical services to an injured employee.  What constitutes reasonable medical services under § 2322(a) is not defined by statute and, therefore, is left to be determined by the Board on a case-by-case basis."); *Bd. of Pub. Educ. v. DiGiacomo*, 1985 WL 189283, at *1 (Del. Super. Sept. 25, 1985) (interpreting 19 *Del. C.* § 2350(f), which provides the court may "allow a reasonable fee to a claimant's attorney," and reasoning the statute requires that the "the Court [to] determine a reasonable fee in its discretion on a case by case basis as to any appeal"); *Triumph Mortg. Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2020 WL 3577839, at *3 (Del. Super. June 30, 2020) ("Reasonableness is a fact-intensive legal conclusion that depends on the circumstances of the case.").

[288] *E.g., Coleman*, 854 A.2d at 842 (explaining the application of the "discovery rule" where claims are brought against a fiduciary "is necessarily based on the facts of each case"); *Isaacson, Stolper & Co. v. Artisan's Sav. Bank*, 330 A.2d 130, 133 (Del. 1974) ("Application of the 'time of discovery' rule is limited, and each case must stand or fall on its own facts . . . ."); *see also Pack & Process, Inc. v. Celotex Corp.*, 503 A.2d 646, 651 (Del. Super. 1985) (observing in an action brought by a property owner against a roofer the "relationship between the parties was such that the existence of roof defects and the cause

And as I held on summary judgment, "a plaintiff may establish a lack of inquiry notice by showing justifiable reliance on a professional or expert whom they have no ostensible reason to suspect of deception."[289]   The parties agree the "appropriate standard" for assessing whether a "report" put a beneficiary on inquiry notice takes into account whether the beneficiary had reason to distrust or otherwise be suspicious of the trustee.[290]   Delaware law recognizes a beneficiary is entitled, and in fact encouraged, to rely on her trustee.[291]  "The trust relationship has utility only if beneficiaries feel at ease confiding in and relying upon the trustee."[292]  "Since trust and good faith are the essence of this relationship, it would be corrosive and contradictory for the law to punish reasonable reliance on that good faith by applying the statute of limitations woodenly or automatically to alleged self-interested

---

of the leaks was the responsibility of the defendant, and, as such, not a condition about which plaintiff should have been knowledgeable").

[289] MSJ BR at 13.

[290] DAB at 22 (acknowledging the "appropriate standard for assessing whether a report" under Section 3585 put a beneficiary on inquiry notice must consider the beneficiary's reasonable reliance on the trustee (citing MSJ BR at 15)); MSJ BR at 15 ("I conclude the Court should consider that a beneficiary plaintiff is entitled to rely on her trustee when assessing whether the beneficiary plaintiff reasonably should have inquired into the existence of any claims."); *see* PRB at 26 ("[A] plaintiff may establish a lack of inquiry notice by showing justifiable reliance on a professional or expert whom they have no ostensible reason to suspect of deception." (quoting MSJ BR at 17)).

[291] *Reed v. Del. Tr. Co.*, 1995 WL 317013, at *2 (Del. Ch. May 19, 1995) ("*Cestui que trust* are encouraged to trust those who have agreed to serve as trustees.").

[292] *Id.* at *3.

violations of trust."[293] A beneficiary is entitled to rely on his trustee "until [he] had 'reason to know' that a wrong has been committed."[294]

In my view, the considerations informing whether a beneficiary reasonably should inquire into a claim against his trustee also appear in precedent applying the discovery rule in the client-professional context.[295] Under the discovery rule, the applicable statute of limitations is tolled where "the injury is inherently unknowable and the claimant is blamelessly ignorant of the wrongful act."[296] A court determining whether a lay client has cause to distrust its own trusted professional must consider "[t]he professional nature of the relationship," "the plaintiffs' inability to acquire by other means [the] information" giving rise to claims against the professional, and "the need for persons in the plaintiff's position to rely upon" the professional's

---

[293] *Kahn v. Seaboard Corp.*, 625 A.2d 269, 275 (Del. Ch. 1993).

[294] *Dean Witter*, 1998 WL 442456, at *5 (quoting *Pack & Process*, 503 A.2d at 650); *see also Volftsun/Landy*, C.A. No. 4635-VCL, at 723–24 (concluding "sophisticated" business partners had "no[] good reason . . . to believe that Wilmington Trust was abdicating its fiduciary duties" or failing to operate in accordance with the trust instrument, as the "supersmart guys" "weren't terribly familiar with the ways and wiles of trust companies and the management of massive wealth," and were not on notice of a problem until a trust officer informed them).

[295] *See Coleman*, 854 A.2d at 842 (citing *Isaacson*, 330 A.2d at 132–33).

[296] *Coleman*, 854 A.2d at 842.

expertise.[297] The Court has recognized whether a lay client had reason to distrust its trusted professional "must stand or fall on its own facts."[298]

In *Coleman v. PricewaterhouseCoopers, LLC*, the Delaware Supreme Court found an email "by itself" to be insufficient "to impose upon the plaintiffs a duty to conduct a further investigation" where the email contained "no 'red flag' that clearly and unmistakably would have led a prudent person of ordinary intelligence to inquire" whether her accountant violated certain accounting principles.[299] Likewise, in *Isaacson v. Artisan's Savings Bank*, the Supreme Court applied the discovery rule where an accountant changed the plaintiff's accounting practices, but failed to obtain the governmental consent required by statute.[300] The statute of limitations was tolled until the plaintiff received actual notice of the deficiency because "the relationship was one of confidence and reliance by plaintiff on the expertise of defendant[.]"[301] The *Isaacson* Court further explained that application of the discovery rule "is limited and each case must stand or fall on its own facts."[302]

---

[297] *Id.*

[298] *Id.* at 842–43; *Isaacson*, 330 A.2d at 134.

[299] *Coleman*, 854 A.2d at 843.

[300] *Isaacson*, 330 A.2d at 132.

[301] *Id.* at 133.

[302] *Id.*

The September 2019 Production certainly did not give Hillblom actual notice that WTC refused to engage with S&P in bad faith, wrongfully left Hillblom to defend against S&P's claim himself, and then declined to share that offer with their beneficiary defending against the same claim.[303] WTC does not contend it provided actual notice; it asserts it gave Hillblom reasonable inquiry notice.[304]

But the September 2019 Production gave Hillblom no reason to suspect WTC's breaches. The September 2019 Production contained seven documents, none of which discussed or disclosed S&P's 2016 S&P Offer.[305] The September 2019 Production informed Hillblom that WTC twice offered to settle S&P's demand for payment, and WTC resisted paying on the distributions based on its interpretation of the Fee Agreement.[306] It painted a picture that WTC was dutifully protecting the Trust from requests that exceeded what the Fee Agreement allowed.[307] It includes WTC's acknowledgement that S&P was owed a fee and that WTC had a fiduciary duty to pay its fee.[308] And it includes a check for "final payment on ARW" from the

---

[303] DAB at 20 (arguing "it is irrelevant for purposes of inquiry notice" that the September 2019 Production did not include the 2016 S&P Offer); s*ee* generally JX 63 (omitting the 2016 S&P Offer and any discussion of it).

[304] DAB at 20, 36, 45.

[305] *See supra* Section I(F).

[306] *Id*. at 4–9.

[307] *Id*. at 19–20.

[308] *Id*. at 5 (acknowledging WTC's fiduciary duty to pay S&P in accordance with the Fee Agreement); *id*. at 4–9 (offering to resolve S&P's claim for $79,086).

50

Trust, indicating WTC was satisfying its obligations.[309]    Contrary to WTC's argument, that information is not a "red flag" that WTC abdicated its duties to Hillblom; it tends to show an attentive trustee trying to resolve a dispute.

And when Hillblom received the September 2019 Production, he had no reason to be suspicious of WTC. Throughout Hillblom's life, WTC had intimately handled all his financial obligations and ensured he received personal support.[310] With respect to S&P's request for fees, WTC conveyed to Hillblom, in a serious and deeply staffed conversation, that S&P's claim against Hillblom was "easily dismissible."[311] The September 2019 Production's disclosures of WTC resisting overpayment and giving lowball offers dovetailed with its explanation that S&P's claims were not serious. Hillblom and Ribakoff both reasonably believed WTC, as Hillblom's fiduciary, was their partner in resolving this issue—not a potential adversary in litigation.[312]

In a remarkable litigation position, WTC contends Hillblom should have been suspicious of WTC by September 2019. Specifically, WTC contends Hillblom should have viewed the September 2019 Production with skepticism given the

---

[309] *Id*. at 9.

[310] *E.g.*, Hillblom Tr. 423–25, 451–52; JX 42 (paying Hillblom's legal fees in an unrelated matter).

[311] Hillblom Tr. 440.

[312] *Id*. at 476, 477; Ribakoff Tr. 66.

Arbitration Complaint's harsh words for WTC.[313] It points to the Arbitration Complaint's allegations that Hillblom through his agent, WTC, breached the Fee Agreement;[314] WTC never intended to value ARW, but only sought to avoid paying S&P;[315] and that WTC asserted in "bad faith" it would pay S&P based on ARW's Form 706 valuation.[316] But to a dependent, uninformed, and trusting beneficiary, S&P's sparse allegations tell a story of a routine breach of contract claim.[317] The Arbitration Demand does not include any reference to S&P's 2016 offer or the fact that WTC ignored it, nor any of the details of WTC's bad faith failure to engage with S&P on valuing and paying its claim.[318] Nor does it allege that WTC concealed or misrepresented aspects of the dispute from Hillblom. The Arbitration Complaint gave no reason for Hillblom to become suspicious of his trustee. Particularly given Hillblom's complete and intimate trust and dependence on WTC for his livelihood and life decisions, Hillblom did not have reason to believe WTC had wronged him or concealed anything from him until S&P shared what it knew, including the 2016

---

[313] DAB at 28–31, 38–45.

[314] *Id.* at 29 (citing JX 57 ¶¶ 7–8).

[315] *Id.* (citing JX 57 ¶¶ 13–14).

[316] *Id.* (citing JX 57 ¶ 14).

[317] The Arbitration Complaint asserted a sole breach of contract claim under the Fee Agreement. *See generally* JX 57.

[318] *Id.*

S&P Offer, with Hillblom.[319] Even after S&P shared its archive with Hillblom in the fall of 2019, Ribakoff and Hillblom still reasonably believed they and WTC were on the "same team."[320]

WTC also argues the September 2019 Production should have raised Hillblom's suspicions because the production omitted "any communications from [S&P]."[321] That argument is foreclosed by *In re Dean Witter Partnership Litigation*, which concluded "where defendant is a fiduciary, a plaintiff is on inquiry notice when the information underlying plaintiff's claim is readily available."[322] Hillblom's claims are based on communications from S&P that WTC failed to make available to him. The missing communications did not give rise to inquiry notice about those same communications.

More generally, WTC's theory relies on inapposite authority: *Dean Witter*[323] and *Pomeranz v. Museum Partners*.[324] Neither case dealt with the special beneficiary-trustee relationship, but instead addressed whether sophisticated

---

[319] *Dean Witter*, 1998 WL 442456, at *5; *Pack & Process*, 503 A.2d at 650; *Volftsun/Landy*, C.A. No. 4635-VCL, at 723–25.

[320] Ribakoff Tr. 66, 82–83; Hillblom Tr. 476–77.

[321] DAB at 30.

[322] 1998 WL 442456, at *8.

[323] *Id*.

[324] 2005 WL 217039, at *3.

investors were on notice of claims against their fiduciaries.[325]  In each case the defendants disclosed to the plaintiffs "red flags" comprising the factual bases of the plaintiffs' claims.[326]  In *Dean Witter,* the plaintiffs claimed the company's financial health was concealed, but the very report relied upon to support plaintiffs' claims revealed a financial decline.[327]  The Court's conclusion the plaintiffs were on inquiry notice turned on the disclosure of "inherently contradictory information" blatant enough to constitute a "red flag to any investor" that was located in the very report the plaintiffs claimed concealed the malfeasance.[328]  And in *Pomeranz*, the Court found "obvious warning signs" and "red-flags" in reports provided to the plaintiffs,

---

[325] *Dean Witter*, 1998 WL 442456, at *1–3 (addressing claims brought by plaintiffs that invested in a consortium of limited partnerships that held interests in real property); *Pomeranz*, 2005 WL 217039, at *12 ("A rational limited partner investor in a single purpose entity . . . should have suspected that the loss of 60% of the Partnership's available capital very well might endanger that business strategy. . . . Less capital leads to owning fewer shares which, in turn, leads to less pressure which thus calls the whole strategy into question.  The plaintiffs, as rational investors, should have begun asking questions.").

[326] *Dean Witter*, 1998 WL 442456, at *8 (finding "blatant contradiction[s]" in an annual report "should have been a 'red flag' to any investor-and should have prompted an inquiry by plaintiffs into the health of their investments."); *Pomeranz*, 2005 WL 217039, at *12 ("Plaintiffs must remain alert to red-flags that should prompt an inquiry by plaintiffs into the health of their investments . . . . Here, the plaintiffs were on inquiry notice of the per se breach of the LP Agreement represented by the withdrawal, . . . the difficulty of achieving the Partnerships goals . . . and the drastic and unexplained reduction of the Partnership's value . . . .").

[327] *Dean Witter*, 1998 WL 442456, at *8 ("It is not too much to ask investors to read beyond the first page of an annual report . . . and actually look at the cold, hard figures provided to them.").

[328] *Id.* at *8–*9.

so much so the plaintiffs were forced to concede the alleged breach was not concealed.[329]

The September 2019 Production did not put Hillblom on inquiry notice that his trustee had mishandled S&P's fee request, much less that his trustee had received, ignored, and not shared a favorable settlement offer for the very claim S&P was bringing against him. WTC has failed to start the clock as of September 2019. Its untimeliness defense fails.[330]

### C. Hillblom's Failure to Pay Claims Are Not Waived.

Next, WTC argues Hillblom's Failure to Pay Claims are waived.[331] WTC claims Hillblom's post-trial opening brief failed to brief his Failure to Pay Claims.[332] Not so.

---

[329] *Pomeranz*, 2005 WL 217039, at *14; *id*. at *11 ("THE COURT: But when your clients got this thing [the March 31, 2000 financials], they might have known that somebody large withdrew. [PLAINTIFFS' COUNSEL]: That's correct, Your Honor. They did know. I mean, I can't argue that looking at this, you don't know it's NorthStar."); *id*. at *12 ("Having conceded that inquiry notice of NorthStar's withdrawal existed as early as April 2000, the plaintiffs have attempted to change the focus of their argument to emphasize that although they had inquiry notice of their claims that NorthStar's demand to withdraw, and Edelman's acceptance of that demand, were improper under the LP Agreement and under fiduciary principles . . . . [T]he plaintiff is arguing that inquiry notice does not run until it had notice of the full economic impact of the wrong. That is not the law—'having all the facts necessary to articulate the wrong is not required.'").

[330] Since I find the September 2019 Production did not put Hillblom on inquiry notice, Section 3585's one-year statute of limitations does not apply. I do not need to reach whether the September 2019 Production constitutes a report under Section 3585.

[331] DAB at 46.

[332] *Id*.

"The doctrine of waiver operates to ensure fairness by requiring that notice be given to the adverse party."[333] The first page of Hillblom's post-trial opening brief states: "Wilmington Trust had an admitted fiduciary duty to pay the law firm of [S&P] a fee that the firm earned on behalf of [Hillblom] on an asset of the Trust."[334] That brief then discusses WTC's admissions, both at trial and over the course of decades, that it had a fiduciary duty to pay S&P, but failed to do so.[335] Hillblom's Failure to Pay Claims were the focus of a three-day trial, briefed extensively pre-trial, and included in the parties' pretrial order.[336] Hillblom's Failure to Pay Claims are not waived.

### D.    Damages

"[O]nce a right to relief in Chancery has been determined to exist, the powers of the Court are broad and the means flexible to shape and adjust the precise relief to be granted so as to enforce particular rights and liabilities legitimately connected

---

[333] *Lavin v. W. Corp.*, 2017 WL 6728702, at *12 n.91 (Ch. Dec. 29, 2017) (declining to find an argument waived where it is "squarely" raised in plaintiff's opening brief).

[334] POB at 1.

[335] *Id*. at 11–22, 29, 31, 41.

[336] D.I. 163 at 199–210 (cross-examining Gallagher regarding the Fee Agreement); D.I. 164 at 490–520 (examining Dearman regarding WTC's offers to pay S&P's ARW fees); D.I. 165 at 568–91 (directing Dlott on the interpretation of the Fee Agreement); D.I. 154 at 6–17, 22–24; D.I. 153 at 12, 15–16, 22–24; PTO ¶¶ 14–41.

with the subject matter of the action."[337]  "Equity is primarily responsible for the protection of rights arising under trusts, and will provide the beneficiary with whatever remedy is necessary to protect him and recompense him for loss."[338]  A court of equity strives to return the beneficiary to "the situation they would have been in, if no breach of trust had taken place."[339]  After a breach of trust, the aggrieved is "entitled to be restored to the status quo ante as nearly as the facts and circumstances of each case will permit."[340]  By statute, damages against a trustee for breach of trust may include "the amount required to restore the value of the trust property and trust distributions to what they would have been had the breach not

---

[337] *Wilmont Homes, Inc. v. Weiler*, 202 A.2d 576, 580 (Del. 1964); *accord Hogg*, 622 A.2d at 654 ("[T]he trial court has broad latitude to exercise its equitable powers to craft a remedy."); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 715 (Del. 1983) (noting "the broad discretion of the Chancellor to fashion such relief as the facts of a given case may dictate"); *Bullen v. Davies*, 209 A.2d 81, 85 (Del. 1965) (noting that the Court of Chancery "has broad powers to tailor its relief to fit the circumstances and to protect so far as possible the interests of the litigants."); *Parsons v. Mumford*, 1989 WL 63899, at *1 (Del. Ch. June 14, 1989) ("[T]his court retains and exercises the ancient power to shape specific remedies where justice requires and the law is silent."); 1 J. Pomeroy, A Treatise on Equity Jurisprudence § 109 (5th ed. 1941) ("[T]he court of equity has the power of devising its remedy and shaping it so as to fit changing circumstances of every case and the complex relations of all the parties.").

[338] *Bogert's* § 861; *see* Restatement (Third) of Trusts § 95 cmt. a (2012) ("The remedies of, or on behalf of, trust beneficiaries are, with limited exceptions [], equitable in nature . . . and granted against trustees by courts of chancery or other courts exercising equity powers.").

[339] *Cahall v. Burbage*, 121 A. 646, 648 (Del. 1923) (quoting *Freeman v. Cook*, 41 N.C. 373, 377 (N.C. 1849)).

[340] *Cahall*, 121 A. at 648–49.

57

occurred."[341]  "The measure of damages for a breach of trust is the difference between the value of the beneficiary's rights before and after the breach."[342]

Delaware does not "require certainty in the award of damages where a wrong has been proven and injury established."[343]  "Responsible estimates of damages that lack mathematical certainty are permissible so long as the court has a basis to make such a responsible estimate."[344]  At the same time, the Court may not award damages based on "speculation or conjecture"; a plaintiff must demonstrate the defendant caused the harm and its basis for damages must be factually supported.[345]

"Here has been a continued series of bad faith, and it is requisite to the character of public justice, and for example's sake, that the injured party should be completely indemnified."[346]  The equitable remedy here is a monetary judgment to restore Hillblom to the situation he would have been in if WTC had fulfilled its

---

[341] 12 *Del. C.* § 3582(1).

[342] *Reed*, 1996 WL 255903, at *2.

[343] *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *15 (Del. Ch. Oct. 23, 2002) (quoting *Red Sail Easter Ltd. P'rs, L.P. v. Radio City Music Hall Prods., Inc.*, 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992)).

[344] *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010).

[345] *Medek v. Medek*, 2009 WL 2005365, at *12 n. 78 (Del. Ch. July 1, 2009).

[346] *Cahall*, 121 A. at 648 (quoting *Hart v. Ten Eyck*, 2 Johns. Ch. 62, 116 (N.Y. Sup. Ct. 1816)).

duties: if it had paid or defended S&P's ARW claim, or disclosed the 2016 S&P Offer to Hillblom in time for him to act on it.[347]

Hillblom learned of the 2016 S&P Offer when S&P shared its archive of WTC communications with Ribakoff in fall of 2019.[348] By the time Hillblom and Ribakoff learned S&P had offered to resolve its claim for $300,000, that offer was of no value due to WTC's dilatory conduct. After WTC failed to even acknowledge the 2016 S&P Offer, S&P served the Arbitration Demand on WTC, then the Arbitration Complaint against Hillblom; S&P had already incurred over $400,000 in fees in prosecuting its claim against Hillblom.[349]

I believe the remedy here must cover Hillblom's costs in paying S&P's ARW fee over and above the 2016 S&P Offer.[350] Hillblom's costs amount to the $1.4 million the Trust paid S&P minus the $300,000 2016 S&P Offer, and the value the Trust lost from missing the excess $1.1 million.[351]

---

[347] 12 *Del. C.* § 3582(b)(3); *Mennen v. Wilmington Tr. Co.*, 2015 WL 1914599, at *35 (Del. Ch. Apr. 24, 2015).

[348] JX 67 at 147–48; *see* Hillblom Tr. 480–81.

[349] JX 46; JX 57; JX 88 at 2 (noting S&P incurred attorney's fees and costs of $400,0000 in August of 2019).

[350] *See E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 447 n.21 (Del. 1996) ("For example, Buyer may have paid $1,000 for 1,000 widgets. If Seller breaches and refuses to deliver the widgets, Buyer can cover by buying 1,000 widgets from someone else. Buyer may pay more than $1,000, but the breaching party must pay Buyer's costs of cover.").

[351] JX 102; JX 39.

The first piece of those costs is the $1.1 million in lost Trust principal. WTC argues that amount is not recoverable because the $1.4 million settlement is "not tethered to any valuation of ARW at the time of the alleged breach of the Fee Agreement in 2000."[352] But the task is not to appraise S&P's ARW fee; it is to calculate Hillblom's damages, namely the excess he paid given WTC's breaches.[353] Hillblom paid what he did due to WTC's failures: he suffered a loss specifically because WTC did not act on its view of how to value S&P's ARW fee, or defend S&P's claim, or give Hillblom notice of the 2016 S&P Offer. Further, the preponderance of the evidence demonstrated the $1.4 million price tag was

---

I believe these costs also include the fees and costs Hillblom incurred in defending S&P's claims in the arbitration. Restatement (Third) of Trusts § 100 (2012) ("A trustee who commits a breach of trust is chargeable with: (a) the amount required to restore the values of the trust estate and trust distributions to what they would have been if the portion of the trust affected by the breach had been properly administered; or (b) the amount of any benefit to the trustee personally as a result of the breach."); *id.* at cmt. a ("The goal of making the trust and beneficiaries whole is not always taken literally, however, either as a floor or as a ceiling. For example, an award of attorney fees and other costs incurred by the trust or the beneficiaries in remedying the breach is not automatic but a matter of judicial discretion.").

But the trial record provides no basis from which to reasonably estimate those fees and costs. Any award would be "speculative and insufficiently reliable." *Paradee v. Paradee*, 2010 WL 3959604, at *13 (Del. Ch. Oct. 5, 2010); *Medek*, 2009 WL 2005365, at *12 n. 78; *Acierno v. Goldstein*, 2005 WL 3111993, at *6 (Del. Ch. Nov. 16, 2005) (holding "Delaware law does not permit the fact finder to supply a damages figure based on 'speculation or conjecture' where the plaintiff has failed to meet its burden of proof on damages."); *Henne v. Balick*, 146 A.2d 394, 396 (Del. 1950) (holding proof of injury alone is insufficient to allow an award of damages without evidence of the amount of damages).

[352] DAB at 52.

[353] *E.g.*, *Reed*, 1996 WL 255903, at *2; *Cahall*, 121 at 648–49.

reasonable.[354]     Ribakoff agreed to it after obtaining Vranca's trusted expert opinion.[355]   At trial, Hillblom's damages expert Dwight Duncan offered reliable testimony that it was reasonable.[356] And the Fee Agreement includes a prevailing party provision.[357]   When Hillblom settled for $1.4 million, S&P had incurred fees in excess of $400,000.[358]

Where a breach of trust has been established, a beneficiary is entitled to interest sufficient "to give them the net amount that they would otherwise have received as income and to restore to the trust estate any amounts expended from corpus."[359]  This amount should approximate what the Trust could have earned on

---

[354] JX 100; Vranca Tr. 296 (concluding an amount between $1,500,000 and $1,579,500 was a "conservative settlement amount").

Before trial, WTC argued at length that Ribakoff should not have settled S&P's claim because it was time-barred, and that he otherwise mishandled his representation of Hillblom in the arbitration.  D.I. 153 at 24–33; *see* D.I. 136.  WTC abandoned that attack after trial.  DAB at 49–55.  Any argument as to the adequacy of Ribakoff's representation or its intervening effects is waived.  *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[355] Vranca Tr. 288–94; JX 100.

[356] Duncan Tr. 346.  At trial, Duncan fell below this Court's expectations when he was confronted with handwritten notes he had on the stand.  *Id*. at 374–75. The Court reallocated trial time to allow WTC to examine Duncan on those notes.  It is not necessary to strike his testimony.  DAB at 56–57.

[357] JX 2 § IV ¶ A ("Any dispute arising out of the performance of this [Fee] Agreement shall be resolved by binding arbitration. . . . The prevailing party shall be awarded its reasonable attorneys' fees and litigation expenses incurred in the proceeding.").

[358] JX 88 at 2 (providing S&P had incurred $400,000 of fees in prosecuting its claim against Hillblom by August 2020).

[359] *Pennsylvania Co.*, 189 A.2d at 682; *Cahall*, 121 A. at 648; *see* Compl. at Prayer (D).

lost principal if not for the breaches of trust.[360]  "Whether a trustee will be liable for interest on damages to the trust, at what rate and from what date, are factors wholly within the discretion of the Court."[361]  Where departing from a legal rate of interest, "our courts have considered concepts such as the realities of the relationship between the parties, whether a particular party was the primary cause for a delay in the litigation, as well as general "fundamental economic realit[ies]."[362]

The record is thin on the Trust's rate of return.  One financial statement reveals the Trust received 10% in interest on cash in 2001.[363]  According to Axelrod, Hillblom's portfolio had a large stake in general market funds during a period in which such funds enjoyed an average 11.3% return.[364]  And Duncan testified as to

---

[360] *Mennen*, 2015 WL 1914599, at *35; *see Bogert's* § 862 (explaining upon a finding a breach occurred damages can include "recovery of profit that would accrued to the trust had there been no breach of trust."); *Gentile v. Rossette,* 2010 WL 3582453, at *2 (Del. Ch. Sept. 10, 2010)  ("Often, courts have sought to award the plaintiff the return a prudent investor would have realized during the relevant period." (internal quotation omitted)).

[361] *Hogg v. Walker*, 1993 WL 263504, at *2 (Del. Ch. June 30, 1993) (observing "Delaware does not statutorily address the issue of interest awards in breach of trust situations").

[362] *Gentile*, 2010 WL 3582453, at *2 (internal quotations omitted and alteration in original); *see Brandin v. Gottlieb*, 2000 WL 1005954, at *29 (Del. Ch. July 13, 2000) (observing "the rote application of the statutory rate would ignore the realities of the relationship between [the parties]"); *Onti, Inc. v. Integra Bank*, 751 A.2d 904, 926 (Del. Ch. 1999) (noting the sophistication of the plaintiff's investment portfolio justified daily compound interest).

[363] JX 14 at 6; *id.* at 5.

[364] JX 88 at 2.

WTC's ability to earn above-market returns.[365]  It appears the 3.75% legal rate would not restore full value to Hillblom's Trust.[366]  WTC's SEC filings tout its investment portfolios are benchmarked against the S&P 500, as well as the Russell 1000 Growth Index.[367]  I will use the S&P 500 total return benchmark to inform a compound annual growth rate ("CAGR").

The Trust paid the $1.4 million on December 18, 2020.[368]  The CAGR for the S&P 500 total return index from that date to now is 15.2%.  WTC shall pay an additional $167,200.

---

[365] Duncan Tr. 331–32 (opining he "would be shocked" if WTC's returns "couldn't beat the S&P 500"); *see also id*. at 330–35.

[366] 6 *Del. C.* § 2301(a) (defining Delaware's legal rate as 5% over the Federal Reserve discount rate).  The Federal Reserve discount rate is 3.75%.  Board of Governors of the Federal Reserve System: Selected Interest Rates (Daily), https://www.federalreserve.gov/releases/h15/ (last accessed July 8, 2026).

[367] Wilmington Trust Investment Advisors, Inc., Form ADV Part 2A, at 14–15 (the "Form ADV").  The Court can take judicial notice of this public filing, which offers facts that are not reasonably disputed.  Delaware Rule of Evidence 201 governs judicial notice of adjudicative facts.  D.R.E. 201(b).  "Applying Rule 201, Delaware courts have taken judicial notice of publicly available documents that are required by law to be filed, and actually are filed, with federal or state officials."  *In re Rural Metro Corp. S'holders Litig.*, 2013 WL 6634009, at *7 (Del. Ch. Dec. 17, 2013); *see also Lebanon Cnty. Emps.' Ret. Fund v. Collis*, 311 A.3d 773, 798–99 (Del. 2023); *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 n.28 (Del. 2004); *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 70 n. 9 (Del. 1995).

The ADV provides the core equity strategy "seeks superior risk-adjusted returns versus the S&P 500 Index over a full market cycle," a period of "three to five years."  Form ADV at 14.  The ADV also notes the industrial revolution equity strategy "seeks risk-adjusted returns over a multiyear investment horizon superior to the Russell 1000 Growth Index."  *Id*. at 15.  The Trust's financial statement in the record reflects most of the Trust was invested in S&P 500 companies.  JX 14 at 7–8; *see* JX 88 at 2.

[368] JX 102 at 1; PTO ¶ 48.

63

### E. WTC Shall Bear Hillblom's Attorneys' Fees In This Action.

Under the American rule, litigants are generally responsible to bear the cost of their attorneys' fees.[369] "In judicial proceedings involving breaches of trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorneys' fees, to any party, to be paid by another party or from the trust that is the subject of the controversy."[370] Feeshifting is warranted when the trustee's conduct was "grossly negligent or inexcusable."[371] The decision to depart from the American rule rests within the trial court's discretion.[372]

Here, justice and equity require that WTC pay Hillblom's attorneys' fees. WTC dragged its feet on its explicit and known obligation to pay S&P's fees for decades. It could not have done less to resolve the issue; it resorted to a Form 706 valuation everyone knew was useless, then recycled that valuation rather than dig in to solve the problem. When S&P understandably ran out of patience after decades, rather than resolve the issue, WTC threw its beneficiary to the wolves. Worse, WTC told its beneficiary the claims were easily dismissable, while knowing S&P was owed the fee; left its beneficiary to find his own counsel; and repeatedly omitted the fact that S&P had offered to settle the matter, once and for all, for $300,000. It did

---

[369] *Brice v. State Dept. of Correction,* 704 A.2d 1176, 1178 (Del. 1998).

[370] 12 *Del. C.* § 3584.

[371] *Hogg*, 1993 WL 263504, at *3.

[372] *McNeil*, 798 A.2d at 514.

all of this after years of intimately assisting Hillblom with the decisions of his daily life; the contrast in WTC's course of dealing with Hillblom is stark.  And then, once Hillblom sought equity, WTC preyed on his personal struggles to paint him as an unserious person unworthy of this Court's attention.  Hillblom should not have faced any of this; it was WTC's explicit fiduciary duty to handle the S&P fee dispute for him, rather than exacerbate the issue and abandon him in bad faith.

## III.   CONCLUSION

Hillblom is entitled to judgment in his favor on all claims tried.  Within twenty days, Hillblom shall submit an affidavit under Court of Chancery Rule 88 for the attorneys' fees incurred in this action.  Once those fees are resolved, the parties shall submit an implementing final order and judgment.